851 F.Supp. 1329 (1994)
James W. WIEHOFF, Plaintiff,
v.
GTE DIRECTORIES CORP., GTE Directories Sales Corp., and GTE Directories Service Corp., d/b/a GTE Sun Community Directories, Defendants.
Civ. No. 3-91-770.
United States District Court, D. Minnesota, Third Division.
February 24, 1994.
*1330 *1331 Joseph W. Hammell and Catherine R. Landman, Dorsey & Whitney, Minneapolis, MN, for plaintiff.
John W. Polley and David Goldstein, Faegre & Benson, Minneapolis, MN, and Dana B. Bourland, GTE Directories Corp., Dallas, TX, for defendants.

MEMORANDUM OPINION AND ORDER
KYLE, District Judge.

INTRODUCTION
This matter came on for trial before the undersigned and a jury from November 1 through November 10, 1993. The plaintiff, James W. Wiehoff, alleged that the defendants, GTE Directories Corp., GTE Directories Sales Corp., and GTE Directories Service Corp., d/b/a GTE Sun Community Directories (hereinafter collectively "GTE"), discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (1988 & Supp. IV 1992), and the Minnesota Human Rights Act ("MHRA"), Minn.Stat. §§ 363.01-.15 (1992 & Supp. 1993).[1] The Court submitted to the jury the ADEA claim for its determination and the MHRA claim for an advisory verdict.[2] Following three days of deliberation, the jury unanimously declared that it was deadlocked; the Court declared a mistrial and discharged the jury on November 15, 1993.
GTE timely filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. This Court, in its Memorandum Opinion and Order, dated December 27, 1993, granted the motion with respect to plaintiff's ADEA claim and denied it with respect to plaintiff's MHRA claim (Doc. No. 163). This Court retained jurisdiction over the MHRA claim on the grounds of diversity of citizenship. 28 U.S.C. § 1332(a). Pursuant to the Court's December 27 Order, the parties submitted proposed findings of fact and conclusions of law on the liability aspect of the MHRA claim.[3] The Court now addresses that issue.

Background

I. Plaintiff's Employment at Sun
James Wiehoff is a sixty-eight year old resident of Minnesota. His date of birth is October 25, 1925. (Defs.' Exh. 146.) From March of 1981 to April of 1987, Wiehoff was a sales representative for Sun Community Directories ("Sun"), a division of Cowles Media *1332 Company. Wiehoff travelled to businesses in various communities in the greater Saint Paul-Minneapolis metropolitan area (the "Twin Cities area"), soliciting orders for advertising space.[4]
Sun published thirty-two community telephone directories in the Twin Cities area annually. Sun paid its salespersons strictly on a commission basis. Sales representatives received a commission for all renewing customers, regardless of whether the customer increased, decreased or simply maintained the dollar amount of advertising space purchased. Wiehoff testified that, as an employee of Sun, he developed a number of regular customers in the Twin Cities area who consistently renewed their accounts with him.

II. GTE Acquires Sun
GTE is headquartered in Texas and operates at various locations throughout the United States, including the Twin Cities area. Like Sun, GTE publishes telephone directories in which it sells advertising space. In April of 1987, GTE acquired Sun from Cowles Media Company. Prior to GTE's acquisition of Sun, GTE did not publish any telephone directories in the Twin Cities area. The former Sun operation became GTE's Minneapolis Division (hereinafter "the Division").
Immediately prior to the acquisition, Sun employed fifteen outside sales representatives to sell advertising space in its directories. Sun did not employ any inside sales representatives at the time of the acquisition. When GTE acquired Sun, it retained all fifteen Sun sales representatives, including Wiehoff.[5] Wiehoff was sixty-one years of age when he began working for GTE.
Throughout the remainder of 1987, GTE operated the Division in substantially the same manner as Sun had operated it prior to the acquisition. Following the acquisition, GTE appointed Larry Van Rhee as Division Manager. Van Rhee reported to Marilyn Carlson, then GTE's Area Vice President for the Central Region. The Division was in Carlson's region.
GTE's pay plan differed significantly from Sun's. (See generally Pl.'s Exh. 97.) Unlike Sun, GTE paid a base salary. GTE paid commissions only on a sales representative's net increase in advertisers' revenue; a salesperson did not receive a commission if a customer did not increase the amount of advertising purchased. GTE also held sales representatives responsible for advertisers who canceled or reduced their advertising purchases from the previous year; Sun's pay plan had not held sales representatives responsible for cancellations or decreases.
Based on GTE's standard expectations regarding the amount of annual revenues that each sales representative should handle, GTE determined that it only needed ten sales representatives in Minneapolis. (Pl.'s Exh. 100.) Carlson instructed Van Rhee to conduct a reduction in force ("RIF") and terminate five of the fifteen former Sun salespersons. Pursuant to that order, Van Rhee ranked the fifteen sales representatives using four performance criteria that he selected.[6]
On or about January 8, 1988, Carlson flew to Minneapolis to help Van Rhee conduct the *1333 RIF. Carlson and Van Rhee met with all of the former Sun sales representatives. She informed them that GTE would be implementing new policies, procedures and standards of performance in the Division and that things were going to change significantly. She then required all of the former Sun sales representatives to fill out employment applications if they were interested in continuing to work at GTE. She informed them that by the end of the day only ten of them would remain employed by GTE. All of the Sun sales representatives, including Wiehoff, filled out applications. Because all fifteen sales representatives expressed interest in continued employment, GTE used Van Rhee's rankings and terminated the five lowest-ranking representatives. Four of those five were under the age of forty. Wiehoff was retained by GTE. At that time, he was sixty-two years of age.

III. GTE Goes "On Budget"
In January of 1988, Carlson hired Kathy Buffington to replace Van Rhee. Buffington transferred to Minneapolis from Portland, Oregon, where she had worked for GTE as the District Sales Manager for a telephone sales unit. Buffington was employed in the Division throughout most of 1988, leaving in late December. Buffington was assigned to Minneapolis to implement GTE's policies and procedures, methods of operation, and standards of performance.
Buffington organized the ten remaining sales representatives into two "premise sales units," Unit 138 and Unit 99. Each unit was comprised of a number of "premise sales representatives" who reported to and were supervised by a "district sales manager" ("DSM"). The DSMs in turn reported to the District Manager, Ms. Buffington. "Premise sales representatives," like the "outside" salespersons under Sun, travelled to their customers and sold advertising space on the business premises. GTE required that premise sales representatives have two years of prior sales experience and two years of college education. (Defs.' Exh. 6.) GTE's nation-wide standards for the amount of advertising revenue a premise sales representative was expected to handle annually was between $900,000 and $1,500,000. (Id.) Buffington testified that upon her arrival, each sales representative had been handling an annualized average of approximately $300,000 to $400,000 of advertising revenue.
Buffington posted announcements internally and company-wide seeking applicants for the two DSM positions. Tom Joseph, one of the ten remaining Sun sales representatives, was the only local applicant for either position. Buffington hired Joseph as the DSM for Unit 138. Buffington later hired David Fisher as the DSM for Unit 99. Fisher was a former premise sales representative from Portland, Oregon. Wiehoff was assigned to Unit 138, where he was supervised by Joseph. (Pl.'s Exh. 162.)
On February 28, 1988, the Division went "on budget." Under this system, GTE defined a number of markets in the Twin Cities area, which typically corresponded to the directories being published. Pursuant to GTE policy, the Division Manager is responsible for budgeting an expected net increase in revenues for each market. Buffington established budgets for the various markets in the Twin Cities area based upon the 1987 business plan for the Division which Van Rhee had prepared prior to his departure.
After setting the budget for the market, the Division Manager would send the market to the Pre-Sales Department, where it would be "broken" into territories  i.e., bundles of accounts that sales representatives would be expected to complete during a specified number of days (called a "canvass period"). (Defs.' Exh. 162, Yellow policy, at 18A.) GTE used market-breaking procedures designed to insure, as nearly as possible, that sales representatives working in the same market received territories that were nearly equivalent in terms of the number of accounts per day and the amount of revenue per day that each sales representative was expected to handle. (Id. at 18.) The Court finds that these procedures made it difficult, if not impossible, for management to assign particular accounts  which might be perceived by sales representatives to be more or less favorable  to any particular sales representative.
Pre-sales personnel assigned premise sales representatives from the same unit to work *1334 the territories created by the market breaking procedures. Each market was assigned to one unit or the other; territories from the same market were never given to sales representatives from both units. Once a territory is assigned, a salesperson who remains within the same division (in Telephone Sales, Premise Sales, or Special Accounts) is entitled to maintain the same territory for a minimum of three years. (Id. at 18B.)
In 1988, the first year markets were broken under these procedures, Wiehoff and the other former Sun employees lost the major accounts which they had called on in previous years. All accounts within a market were distributed according to the GTE procedures described above. Buffington set the budget for the market before Pre-sales broke the market into territories; she did not know which sales representatives would be assigned to any particular market. After the Division went on budget, the District Manager and the DSMs were not involved in the initial assignment of specific territories to particular sales representatives.[7]
The Court finds that, after the Division went "on budget," each sales representative was expected to complete his or her territory assignment within the prescribed "canvass period" so that GTE could publish the directory for that market on schedule. Each sales representative was also expected to sell sufficient advertising to meet his or her share of the territory's budgeted net sales increase.

IV. Wiehoff's Performance After the Division Went "On Budget"
After the Minneapolis Division went on budget, GTE began to track the performance of each sales representative in the Division. The Division's sales results appeared bi-weekly on statistical reports generated company-wide. The two principal statistical reports that chronicled the performance within the Division for each pay period were the National Sales Report ("NSR") (Pl.'s Exh. 98) and the Sales Statistical Report ("SSR") (Pl.'s Exh. 95). These reports were distributed bi-weekly to Wiehoff and the other sales representatives.
The NSR reflects, inter alia, the sales representative's actual sales net as a percentage of the budgeted sales net for the sales representative's territory. This figure is referred to as "percent to budget." Each bi-weekly NSR reflects the sales representative's two-week and year-to-date percent to budget. Generally speaking, ninety percent to budget was considered the minimum that would be acceptable over any extended period of time. Buffington generally expected sales representatives in the Minneapolis division to maintain, on a year-to-date basis, one hundred percent to budget. These expectations were made known to all the sales representatives, including Wiehoff.
The SSR reflects, in the column captioned "PI REV.CONT.PMD" (an acronym for present issue revenue contacts per man day), each sales representative's average number of completions per day on a year-to-date basis.[8] The SSR also contains other figures which reflected how the sales representative performed with respect to those accounts that the sales representative actually handled.
After the Division went on budget, Wiehoff's year-to-date percent to budget was almost always less than ninety percent.[9] Wiehoff's year-to-date percent to budget was *1335 also consistently well below that of the other sales representative working the same markets (i.e. the premise sales representatives in his sales unit).[10] Wiehoff's completions per day, throughout his tenure in the Division, were also the lowest in the Division.[11]
On April 14, approximately six weeks after the Division went on budget, Joseph counseled Wiehoff regarding his need to improve "territory control." "Territory control" is, in GTE terms, the ability of a sales representative to complete the territory's accounts within the canvass period. (Defs.' Exh. 162 at 18C.) The timely completion of accounts is necessary so that GTE can meet the publication deadlines for each of its thirty-two directories. Because Wiehoff was behind in territory, Joseph pulled some of Wiehoff's accounts and reassigned them to other sales representatives to insure that the market was completed on schedule. (Defs.' Exh. 7.) Pulling territory under such circumstances is in accordance with GTE policies and practices.[12] (Defs.' Exh. 162, at 18C.)
On April 20, Joseph accompanied Wiehoff on sales calls and "field coached" him. Joseph specifically noted on the "field coaching report" that Wiehoff's territory control was "poor" (on a four-point scale ranging from "poor" to "excellent"), and was "still the major concern." Joseph noted that Wiehoff needed to schedule sales calls closer together. Wiehoff signed the field coaching report and wrote "I disagree with parts of the report," but did not indicate which parts.[13] (Defs.' Exh. 8.)
*1336 On April 29, Joseph again counseled Wiehoff by letter about his territory control problem, noting that Wiehoff was "hopelessly behind in territory." Joseph set up a specific plan designed to help Wiehoff increase his completions per day and regain control of his territory. The April 29 letter was an official warning letter, in which Joseph informed Wiehoff that failure to complete his assigned revenue and remain on daily call schedule by May 13 would result in final probation or reassignment. (Defs.' Exh. 10.) Joseph asked Wiehoff to talk to Buffington about the warning letter (Defs.' Exh. 11), but Wiehoff never did so.
On May 27, Joseph wrote to Wiehoff concerning the April 29 "warning probationary letter." The May 27 note stated that Wiehoff had not followed the plan contained in the probation letter. The third paragraph of the May 27 letter in essence reiterated the plan contained in the April 29 letter. The May 27 letter also informed Wiehoff that his percent to budget was unsatisfactory and concluded that "you may be terminated on June 17, 1988 unless drastic improvement on territory control and percent to budget has occurred." (Defs.' Exh. 13.)
On June 4, Joseph gave Wiehoff a handwritten note containing further recommendations regarding what Wiehoff needed to do to regain control of his territory. Joseph informed Wiehoff that his problems seemed to stem from a lack of organization, a failure to schedule appointments in the same geographical areas, and a need to schedule more appointments per day. (Defs.' Exh. 16.) On June 7, Joseph again field coached Wiehoff. Joseph rated Wiehoff's territory control as "poor" and again noted that Wiehoff needed to be better organized. Joseph specifically urged Wiehoff to focus on accounts in books that were near the close of the canvass period. (Defs.' Exh. 17.)
On June 9, Buffington extended Wiehoff's June 17 probationary deadline to June 30 to give Wiehoff more of an opportunity to work with Joseph. (Defs.' Exh. 18.) In an undated note written sometime in early June, Joseph again informed Wiehoff that he needed to become better organized "in all areas  briefcase, car, desk  we don't want to miss any accounts." (Defs.' Exh. 23.) On June 14, Joseph field coached Wiehoff and again rated his territory control as "poor." In a two-page handwritten note accompanying that field coaching report, Joseph again told Wiehoff that he needed to schedule more appointments per day and in closer geographic proximity. (Defs.' Exh. 19.)
In early June, Wiehoff also received a written performance review from Joseph.[14] In the areas of "territory control," "organization," "production," and "general work habits," Wiehoff was rated "does not meet" company standards. The June performance review also states that the "major problem from day one which builds on itself" is territory control, and states that Wiehoff's organization "needs lots of work  often can't find things  has tendency to lose accounts  even on his desk." The review also indicated that Wiehoff's performance was below budget and that his poor productivity related back to his territory control problems.[15] (Defs.' Exh. 24.)

V. Wiehoff's Transfer to Telephone Sales and Termination
Later in June, Buffington concluded that Wiehoff was not able either to maintain an acceptable percent to budget or to control territory as a premise sales representative. At the end of the scheduled probationary period, Buffington reassigned Wiehoff to the newly-formed telephone sales unit for an additional probationary period of six weeks. (Defs.' Exh. 189.) If Wiehoff demonstrated that he could maintain an acceptable percent to budget and call schedule, he would be taken off probation and would remain permanently in telephone sales. He was explicitly informed that, if he was unable to maintain territory control or write budget, he would be terminated at the end of his probationary period. (Defs.' Exh. 25.)
Telephone sales representatives typically work forty hours per week, as opposed to *1337 premise representatives who regularly work as much as eleven and twelve hours per day. Telephone sales representatives handle a lower volume of annualized advertising revenue; the company standard for telephone representatives is between $400,000 and $600,000 per year in advertising revenue. (Defs.' Exh. 28.) Because telephone sales representatives do not leave the GTE offices, they can receive greater supervision and guidance from their DSM. They are also expected to complete a greater number of accounts per day. The bi-weekly base pay for telephone sales representatives is lower than that for premise sales representatives, yet Buffington did not reduce Wiehoff's base pay when he was reassigned to telephone sales.[16] (Defs.' Exhs. 146, 158.)
Wiehoff's performance in telephone sales did not show any improvement.[17] Wiehoff's DSM in the telephone sales unit, Kathleen Voschell, testified that Wiehoff's performance in telephone sales was worse in terms of territory control, productivity, and organization than any of the other telephone sales representatives who reported to her. In an effort to help Wiehoff get organized, gain control of his territory, and meet publication deadlines, Voschell worked late with Wiehoff and allowed him to work overtime, even though telephone sales representatives were not generally permitted to work overtime without the express prior approval of senior management.
On or about August 16, Buffington decided to terminate Wiehoff's employment.[18] (Pl.'s Exh. 292.) She made this decision after having consulted with Johnnie Ross-Williams, Human Resources Manager, in accordance with GTE's policies and procedures. Ross-Williams concurred in the decision, as did Carlson. (Pl.'s Exh. 296.) Wiehoff's employment was terminated on Friday, August 26, 1988.[19] (Pl's Exh. 302.) Wiehoff was sixty-two years old when he was terminated. The Court finds that, by June 1989, GTE employed none of the former Sun sales representatives, many of whom were younger than forty years old, in any sales capacity.

*1338 ANALYSIS

I. Method of proof under the MHRA
The MHRA makes it unlawful for an employer to discriminate on the basis of age against an employee with respect to "tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn.Stat. § 363.03, subd. 1(2)(c) (Supp. 1993). Nor can an employer discharge an employee on the basis of age. Id., subd. 1(2)(b). Wiehoff alleges that, because of his age, he was treated less favorably than younger employees in the terms and conditions of his employment. Specifically, Wiehoff claims that he was treated differently with respect to the performance expectations set for him, the assignment of sales territories and accounts, and the enforcement of company policies. Wiehoff further alleges that he was transferred to telephone sales and ultimately discharged because of his age.
Due to the substantial similarities between Title VII and the MHRA, the Minnesota Supreme Court has adopted the three-part analysis set forth for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in adjudicating disparate treatment employment discrimination claims under the MHRA.[20]Feges v. Perkins Restaurants, Inc., 483 N.W.2d 701, 710-11 (Minn.1992); Sigurdson v. Isanti County, 386 N.W.2d 715, 716 (Minn.1986); Danz v. Jones, 263 N.W.2d 395, 399 (Minn.1978). The McDonnell Douglas analysis consists of a prima facie case, an answer, and a rebuttal. Sigurdson, 386 N.W.2d at 720. The Court addresses each part of that analysis below.

A. Prima facie case
Under Minnesota law, a plaintiff bringing an age discrimination action under the MHRA may state a prima facie case with either direct or circumstantial evidence of discriminatory intent. Feges, 483 N.W.2d at 710 & n. 4. Wiehoff contends that he has produced direct evidence of discriminatory intent in the form of a number of written and verbal statements made by GTE management personnel. Alternatively, Wiehoff contends that he has presented sufficient circumstantial evidence to create an inference that GTE discriminated against him on the basis of age. The Court will consider each method of proof in turn.

1. Direct Evidence
A plaintiff may establish a prima facie case by direct evidence of discriminatory motive, such as where an employer announces he will not consider older persons for positions. See Sigurdson, 386 N.W.2d at 720 (citing Hardin v. Stynchcomb, 691 F.2d 1364 (11th Cir.1982)). "Direct evidence" shows a specific link between the discriminatory animus and the challenged employment decision.[21]Stacks v. Southwestern Bell Yellow Pages, 996 F.2d 200, 201 n. 1 (8th Cir. 1993). Direct evidence does not include stray remarks, statements by non-decisionmakers or statements by decisionmakers that are not related to the decisionmaking process.[22]Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir.1991).
*1339 Wiehoff has identified a number of comments and actions made by Buffington as "direct evidence" of GTE's bias against older employees.[23] Wiehoff claims that Buffington said she thought Wiehoff's ways were from the "old school." Wiehoff also points to two documents Buffington sent to her supervisor, Marilyn Carlson, in which she referred to Wiehoff as "an older P-rep [premise rep.]" and "a 63 year old telephone rep."[24] Finally, Wiehoff asserts that a portion of an article that Buffington copied and circulated to employees in the Division is evidence of Buffington's discriminatory animus. (Pl.'s Exh. 20.)
Evidence that Buffington made the "old school" comment came from Joseph on redirect examination. Joseph stated on re-cross examination that it might have been only his impression that Buffington thought Wiehoff was from the old school; Buffington denied making any such remark. The Court finds that Wiehoff failed to establish that Buffington made this statement.
Buffington's written references to Wiehoff, contained in the memoranda to Carlson, are not direct evidence of discriminatory animus. A statement that refers to an employee's protected status, but fails to express any bias against the individual because of that status, is not sufficient to establish a prima facie case. Rutherford v. County of Kandiyohi, 449 N.W.2d 457, 461-62 (Minn.Ct.App.1989); cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("Race and gender always `play a role' in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion."). Wiehoff has offered no evidence linking these neutral, nondiscriminatory age references to any bias on Buffington's part. The Court reads the "63 year old telephone rep" reference in the context of the entire memorandum, which discusses the possibility of "bridging" Wiehoff's employment so that his GTE pension would vest under GTE's new policy, effective January 1, 1989.[25] This memorandum was circulated after Buffington had made the decision to terminate Wiehoff and states clearly that the decision to "bridge" would have no impact upon that termination. The Court concludes that the reference to Wiehoff as a "63 year old" telephone sales representative is merely a stray remark.
Similarly, the Court concludes that the "older P-rep" reference, used to describe Wiehoff in the April activity report, is not direct evidence of discriminatory animus. The comment does not correlate Wiehoff's age to his performance;[26] as Buffington testified, and the Court finds, it merely identified Wiehoff for Carlson. The Court concludes that neither statement written by Buffington is direct evidence of discriminatory intent.
Nor is the portion of a media piece that Buffington copied and circulated to employees *1340 in the Division direct evidence of age bias on Buffington's part. The piece quotes a New York-based recruiter's statement about what characteristics tend to "earmark young fast-trackers for corporate success." Buffington circled the characteristic "follow through" and wrote
People  This is great. A quote for the day that rings true with me: "As I grow older, I pay less attention to what men say and more attention to what they do." Execution of the plan is critical to our success. Thanks for another great week. Pay period 4  week 1: 61% book net  Outstanding! (emphasis in original)
Buffington testified, and the Court finds, that she circulated the article because of the characteristic listed there. There is no indication that Buffington adopted that part of the article referring to "young" fast trackers. The Court concludes that this does not constitute direct evidence of Buffington's intent to discriminate on the basis of age. Thus, Wiehoff has failed to produce direct evidence indicating a discriminatory animus among the management at GTE involved in the employment decisions.

2. Circumstantial Evidence
For those cases in which direct evidence is not available, sufficient discriminatory motive for a prima facie case can be established through facts that create an inference of unlawful discrimination because such facts, unless otherwise explained, are more likely than not to be based on impermissible factors. Feges, 483 N.W.2d at 711 (citing Furnco Constr. Corp. v. Wates, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978)). The elements of the plaintiff's prima facie case, when circumstantial evidence is utilized, depends upon the specific facts and employment context involved. See Sigurdson, 386 N.W.2d at 720 (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 442 (Minn.1983)). Wiehoff seeks relief for GTE's actions in three employment contexts: the terms and conditions of his employment, his transfer to telephone sales, and his discharge. Due to the similarities in the prima facie cases for the latter two contexts, the Court will group them together.

a. Terms and conditions of employment
Wiehoff claims that he was treated differently because of his age with respect to the performance expectations set for him, the assignment of sales territories and accounts, and the enforcement of company policies. The Court finds, however, that Wiehoff has failed to adduce any evidence that would support an inference that he was treated differently in these aspects of his employment because of his age.
First, Wiehoff claims that he was unfairly required to complete sixrather than three  accounts per day as a premise sales representative when he was placed on probation. Yet, evidence introduced by the plaintiff himself reveals that another younger premise sales representative was required to complete eight accounts per day when he was placed on probation. (Defs.' Exh. 368.) Second, Wiehoff alleges that he was disproportionately assigned undesirable territories, particularly those which an overly aggressive salesperson had worked before the Division went on budget. Yet Wiehoff offered no evidence other than his own subjective beliefs that he had received an unfair number of these accounts.
Finally, Wiehoff asserts that GTE policies were not applied to him on the basis of his age. Wiehoff alleges that he was not allowed to "follow himself" in the major accounts he had held before the Division went on budget and that territory was not distributed by a draw method. The Court finds that Wiehoff misconstrues both of the policies he alleges should have applied to him. The GTE manual provides that "once a territory is assigned, a salesperson who remains within the same Division (Telephone, Premise and Special Accounts) is to maintain the same territory for a minimum of three years." (Defs.' Exh. 162, at 18B.) During his employment at Sun, and for the first several months after GTE acquired Sun, Wiehoff had worked various large accounts all over the metropolitan area. GTE first assigned territories, however, to which the "follow yourself" policy applies, when the Division went on budget in February of 1988. The GTE manual also states that "in the event a territory is rebroken, including those for DSM's they will be assigned *1341 by the draw method." (Id.) The policy clearly contemplates redistributing territories which had already been assigned to salespersons. In 1988, however, territory was being distributed for the first time.
Wiehoff's arguments regarding his rights under those policies are misplaced, attempting to compare the time prior to the Division going on budget and the time after the Division went on budget. The Court concludes that Wiehoff has failed to state a prima facie case that GTE applied policies or controlled the terms and conditions of his employment in a discriminatory manner.

b. Transfer and Termination
When the McDonnell Douglas analysis is adapted to a discriminatory transfer or termination setting, a plaintiff can make out a prima facie case of age discrimination by establishing that (1) he is a member of the protected class; (2) he was qualified for the position from which he was transferred or discharged; and (3) the employer replaced him by someone else who would provide the same service or skill.[27]Feges, 483 N.W.2d at 711; Raschick v. Prudent Supply Co., 830 F.2d 1497, 1499 (8th Cir.1987), cert. denied 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).
Of the elements defined above, it is undisputed that Wiehoff is within the protected class. It is also undisputed that GTE hired other premise and telephone sales representatives during the relevant time period. GTE disputes, however, that Wiehoff was qualified for either (a) the position from which he was reassigned (premise sales), or (b) the position from which he was discharged (telephone sales).
Although GTE contends that the Court must assess Wiehoff's "qualifications" in terms of the adequacy of his job performance,[28] the Court concludes that under Minnesota law, questions of job performance are dealt with in the defendants' rebuttal case. Hubbard, 330 N.W.2d at 443 & n. 15. The Court therefore defers its discussion of Wiehoff's job performance until that time.
The position questionnaires describing the premise and telephone sales representative positions indicate that GTE required their premise and telephone sales representatives to have (1) two years college or business experience, and (2) two years outside sales experience, preferably from an incentive or bonus atmosphere. (Defs.' Exhs. 6 & 28.) Wiehoff testified, and the Court finds, that he had received at least two years of college education from the University of Minnesota. The Court also finds that Wiehoff had been employed in a commissioned sales position for over two years at Sun alone. The Court concludes that Wiehoff met the qualifications for the positions he held at GTE. Wiehoff has stated a prima facie case of discriminatory transfer and termination. The Court now turns to the defendant's rebuttal of the prima facie case.

B. Defendant's Answer
Once the plaintiff successfully establishes a prima facie case, a presumption arises that the employer unlawfully discriminated against the employee. Sigurdson, 386 N.W.2d at 720 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). The burden of production shifts to the employer *1342 to present evidence of a legitimate, non-discriminatory reason for its action.[29]Id.
GTE contends that it transferred and ultimately discharged Wiehoff due to his substandard job performance and his demonstrated lack of improvement. The position questionnaires describing the positions of premise and telephone sales representatives both state that the basic function of those jobs is to "manage a sales territory in order to meet and exceed sales objectives while handling accounts within an allotted time frame." (Defs.' Exhs. 6 & 28.) Specifically, once the Division went on budget, GTE required its premise sales representatives to complete three accounts per day and sell the dollar amount budgeted for the sales representative's territory. GTE required its telephone sales representatives to complete six accounts per day and meet the budgeted increase for the territory.
The Court finds that the nature of Wiehoff's job changed dramatically once the Division went on budget. Management personnel from GTE testified that the "completions per day" criterion became particularly important; the sales staff needed to complete the assigned accounts within the canvass period because GTE publishes numerous directories on overlapping schedules. In addition to managers Joseph and Buffington, two former Sun sales representatives who worked for GTE after the Division went on budget  Doris Egesdahl and Ed Geffon  testified that the work became much more demanding and paper-intensive after the Division went on budget. The figures contained in the NSR and SSR demonstrate that Wiehoff failed to generate either the volume of sales or the dollars in revenue that GTE demanded. Furthermore, the performance evaluation and field coaching reports indicate that Wiehoff had difficulty with organization and processing paperwork. Thus, Wiehoff failed to perform in his positions as premise and telephone sales representative according to the requirements set by GTE.
The Court concludes that GTE has met its burden of production with respect to a non-discriminatory reason for its employment actions. Although Wiehoff may have adequately performed under the Sun method of operations, Wiehoff's job changed after the Division went on budget. It became critical for sales representatives to control their territories and meet the budgeted net sales quotas that were established. Wiehoff never met sales objectives after the division went on budget, nor did Wiehoff handle the accounts assigned to him within allotted time frames. In fact, he was repeatedly counseled about his failure to control his territories and meet budget. Thus, GTE has established a legitimate nondiscriminatory reason for its transfer and discharge of the plaintiff.

C. Plaintiff's Rebuttal
When the defendant produces a legitimate reason for its employment decision, the presumption of discrimination evaporates and the plaintiff must prove his case by proving that it is more likely than not that the proffered reason is either a pretext for discrimination or not worthy of belief. Feges, 483 N.W.2d at 711; Schockency v. Jefferson Lines, 439 N.W.2d 715, 719 (Minn.1989). Even if an employer has a legitimate reason for an employment action, a plaintiff may nevertheless prevail if an illegitimate reason "more likely than not" motivated that action. McGrath v. TCF Bank Savings, fsb, 509 N.W.2d 365, 366 (Minn.1993).
Wiehoff has not established by a preponderance of the evidence that an illegitimate reason motivated GTE's employment decisions. Wiehoff contends that GTE gave preferential treatment to a similarly situated younger sales representative, Jeff Boehler. The comparison of the plaintiff to one unprotected person, however, is "too narrow an inquiry. It is [the employer's] treatment of all its employees that must be considered." Shockency, 439 N.W.2d at 720. Assuming arguendo that a direct comparison of Wiehoff and Boehler were a legitimate means of establishing pretext, the Court nevertheless concludes that the evidence is insufficient.
Wiehoff's evidence respecting Boehler's performance deficiencies relies heavily *1343 upon the SSR. Trial testimony established, and the Court finds, that the statistic measuring "revenue increased to revenue handled" does not reflect the criteria by which GTE measured successful performance. Wiehoff's comparison to Boehler is also inappropriate because Boehler worked in a different premise sales unit; thus, Boehler was assigned to different markets with different budgets. Furthermore, the Court finds that, unlike Wiehoff, Boehler more consistently (1) had an acceptable rate of completions per day, (2) performed above 100 percent to budget on a year-to-date basis, and (3) demonstrated good organizational skills. (Pl.'s Exhs. 191, 202 & 211; Defs.' Exh. 368.) The Court finds, upon examination of Boehler's field coaching reports, that his only major flaw was insufficient aggressiveness in arranging appointments and securing increases in customers' accounts. Thus, Boehler's and Wiehoff's performances were substantively different. The fact that others with performance deficiencies were not transferred or fired does not necessarily prove that the real reason for the plaintiff's transfer or termination was unlawful age discrimination. See Feges, 483 N.W.2d at 711.
The Court concludes that plaintiff has not met his burden of persuasion with respect to the ultimate question of whether age played a part in GTE's decisions to transfer and ultimately terminate him. The Court finds that GTE transferred and ultimately discharged Wiehoff for legitimate non-discriminatory reasons, namely his prolonged substandard job performance.

CONCLUSION
Pursuant to the foregoing,[30] and upon all the files, records and proceedings herein, IT IS ORDERED that Count I of the complaint, alleging age discrimination in violation of the MHRA, is DISMISSED WITH PREJUDICE.
NOTES
[1] Plaintiff's retaliatory discharge claims under state and federal law were dismissed at the close of all the evidence upon GTE's motion for judgment as a matter of law. See Memorandum Opinion and Order, December 27, 1993.
[2] Whereas the ADEA provides for a trial by jury, 29 U.S.C. 626(c)(2), the MHRA does not so provide, Minn.Stat. § 363.14, subd. 2.
[3] At trial, the Court did not receive evidence relating to those damages that are uniquely recoverable under the MHRA; such evidence was to be received if the advisory jury had found GTE liable for age discrimination. In its December 27 Order, the Court stated that it would continue to proceed in the same manner in deciding the MHRA claim. See Memorandum Opinion and Order, December 27, 1993, at 16 n. 12.
[4] Wiehoff was an "outside" sales representative at Sun, so-called because he solicited customers outside the Sun office at their places of business; by contrast, "inside" sales representatives solicited customers over the telephone.
[5] While employed by Sun, Wiehoff's performance evaluations indicate that he had some difficulty complying with Sun's paper work requirements. His most recent performance evaluation at Sun indicated that he had some difficulty understanding and following instructions. His overall evaluation was a "2" on a scale of 1 to 4, with 4 being the best. (See Pl.'s Exh. 60.)
[6] The four criteria that Van Rhee used were (1) the number of accounts completed per week, (2) attitude, (3) percentage of accounts written that were new, and (4) revenue increased to revenue handledthe percentage by which the sales representative increased the dollar value of the accounts he or she handled. (Pl.'s Exh. 100.) Carlson testified, and the Court finds, that Van Rhee's ranking criteria were not good predictors of success with GTE because GTE and Sun had different expectations for their sales representatives and different methods of doing business. Carlson believed that it was fair to use the criteria Van Rhee had selected, however, because those were the criteria that Sun had communicated to its employees and had used in the past to evaluate them.
[7] Buffington did assign particular markets to particular units, well prior to markets being broken into territories. Buffington testified, and the Court finds, that, because she had never been to Minnesota before, she had almost no knowledge of the markets in the Division and assigned markets to particular units based upon Joseph's input.
[8] After the January RIF, the ten remaining premise representatives were expected to handle all of the accounts previously handled by fifteen. Thus, the number of accounts per day that the remaining sales representatives were expected to handle and complete increased by approximately fifty percent.

Buffington's goal for the Division was to increase the premise representatives' to three completions per day. See Defs.' Exh. 358, a memorandum dated April 23, 1988 from Buffington to the DSMs admonishing them to tell their sales representatives that "[t]hree (3) accounts per day @ $150200 is not unreasonable and is a mandatory part of the job." (emphasis in original).
[9] The following statistics are drawn from the NSR for the time in which Wiehoff worked as a premise sales representative in Unit 138:

 Pay Period YTD
Pay Period Ending % to budget % to budget
 6 3/12 93.7 13.6
 7 3/26 88.6 96.0
 8 4/09 52.8 87.5
 9 4/23 90.3 88.0
 10 5/07 48.7 81.6
 11 5/21 77.5 80.9
 12 6/04 66.5 79.1
 13 6/18 104.6 81.6
 14 7/02 12.5 75.6
(Pl's Exh. 98.)

[10] At trial, Wiehoff compared his treatment to that of a younger premise sales representative named Jeff Boehler. Boehler worked in Unit 99 under Dave Fisher. He performed as follows:

 Pay Period YTD
Pay Period Ending % to budget % to budget
 6 3/12 132.0 - 30.8
 7 3/26 193.4 186.8
 8 4/09 126.6 170.2
 9 4/23 113.0 149.6
 10 5/07 107.0 136.4
 11 5/21 42.6 111.8
 12 6/04 50.2 101.0
 13 6/18 183.2 110.3
 14 7/02 45.9 99.3
 15 7/16 38.4 91.8
 16 7/30 123.3 96.6
 17 8/13 51.7 91.9
 18 8/27 91.5 91.9
 19 9/10 125.0 92.8
(Pl's Exh. 98.)

[11] Wiehoff's and Boehler's year-to-date completions per day, as reported in the SSR, were as follows:

Period Ending Wiehoff Boehler
 6 3/12 .98 2.61
 7 3/26 .83 2.61
 8 4/09 .88 2.61
 9 4/23 .98 2.69
 10 5/07 1.17 2.77
 11 5/21 1.28 2.70
 12 6/04 1.30 2.82
 13 6/18 1.42 3.05
 14 7/02 1.50 3.14
 15 7/16 1.50 3.22
 16 7/30 1.70 3.29
 17 8/13 1.74 3.14
 18 8/27 1.86 3.20
(Pl.'s Exh. 95.)

[12] In the event the Salesperson falls behind on the territory assignment, the DSM/DSM-T, with the approval of the District Manager, may pull the territory back from the Salesperson to whom it was assigned. The accounts returned to the DSM will be redistributed among the other members of the Unit or Division. The accounts will be worked on a win/loss basis.

(Defs.' Exh. 162, at 18C.) A "win/loss" basis means that if an account that has been reassigned increases, it will be credited to the salesperson who took it over. If the account decreases or cancels, however, it will be reported against the original salesperson from whom it was pulled. If accounts are repeatedly pulled, the policy indicates that the salesperson may be terminated or "accounts may be canceled on the offending representative and re-reported on the Division Manager."
[13] Wiehoff did not testify about any of the field coaching reports or any of the other written reports that he received about his performance. He did, however, on two occasions contemporaneously write on the reports that he disagreed with portions of them. In addition to his statement on Defendants' Exhibit 8, Wiehoff wrote on Defendants' Exhibit 13 that he had never refused an assignment to the telephone sales unit. Those are the only indications in the record of any contemporaneous disagreement by Wiehoff with any of GTE's evaluations of his performance.
[14] The review form evaluates a sales representative's performance in twelve separate areas on which the representative's performance "meets," "exceeds," or "does not meet" company standards. (Defs.' Exh. 24.)
[15] Wiehoff did not dispute Joseph's evaluation of his performance as reflected in Defendants' Exhibit 24.
[16] Boehler took a twenty percent pay cut when he transferred from premise sales to telephone sales in November of 1988. (Defs.' Exh. 310.)
[17] During the six-week period that Wiehoff worked in telephone sales, his completions per day and percent to budget figures were as follows:

 Pay Period YTD YTD
Period Ending % to budget % to budget completions
 16 7/30 71.7 75.2 1.70
 17 8/13 - 35.5 67.3 1.74
 18 8/27 33.1 65.1 1.86
(Pl.'s Exhs. 95, 98.)

[18] On August 16, 1988, Buffington addressed a memorandum to Marilyn Carlson, Area Vice President for the Central Region, which reads as follows:

Jim Wiehoff is a 63 year old telephone rep on probation for lack of productivity, both in the areas of sales net and territory control. He was a premise rep with Sun Directories when GTE bought that company in 1987 and he now has 7 years of Sun/GTE service. His failure to produce caused him to be placed on probation and demoted to T-Sales the first of July. He was placed on probation in T-Sales with a 3 period requirement, to be on budget and on territory by August 29. Since he is 69% to budget YTD and has never maintained call schedule or budget since my arrival, I have no choice but to let him go August 29. His file is well documented, Johnnie Ross-Williams and I have discussed his situation at length and recommend we let him go as scheduled, but with the provision that we pay him a "bridge" of $1.00 per month until January 1, 1989 when the Company's new policy effecting vesting at 5 years will be in effect. We recommend this both due to his being a cooperative employee and our current legal situation in a related issue within the Division....
If you have any questions, please call. In either case, I will move to let Jim go August 29th.
(Pl.'s Exh. 292.)
[19] On August 26, 1988, Katherine Voschell (neé Leach) wrote a memorandum to the Human Resources Department regarding the termination of Jim Wiehoff, which reads as follows:

Tuesday, August 23, 1988, Dave Fisher, DSM-P, and myself discussed Jim Wiehoff's termination to be effective Friday, August 26, 1988. Jim Wiehoff has been on probation since April 29, 1988 and was demoted to T-Sales rep as of 7/4/88. Under conditions of the probation, if he did not maintain proper territory control and write budget he would be terminated August 29, 1988.
Jim Wiehoff has not made budget for 11 pay periods and still remains behind on his territory. We discussed his termination and the reasons why.
(Pl.'s Exh. 302.)
[20] The Minnesota Supreme Court has held that the McDonnell Douglas three-part analysis applies to all disparate treatment claims, regardless of whether they might be labelled as "mixed-motive" or "single-motive." Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 624-27 (Minn.1988).
[21] The court in Stacks noted that, in a hornbook sense, the evidence described in Beshears as "direct" in fact requires an inferential step from the statement proved to the conclusion intended, that a discriminatory motive played a motivating factor in the employment decision; thus, the "direct" evidence in Beshears is actually circumstantial in nature. Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200, 201 n. 1 (8th Cir.1993).
[22] A district court in the Eighth Circuit has recently summarized the analysis which courts have engaged in when classifying statements as "stray remarks."

There appears to be no uniform test for determining whether certain statements fall within the stray remarks doctrine.... [C]ourts look to the relationship between the remarks and the decisional process, the age-based substance of the statements, the specificity of the statements both with regard to the actual employment decision at issue ... as well as the relationship to the remark and the plaintiff's situation, and the remoteness in time to the personnel decision. Holmes v. Marriott Corp., 831 F.Supp. 691, 704-05 (S.D.Iowa 1993).
[23] Wiehoff also argues that Dave Fisher, DSM for Unit 99, made a number of age-biased comments. Evidence at trial established, and the Court finds, that Buffington and Voschell (DSM for telephone sales) made the decision to fire Wiehoff; Fisher had no substantive input in that decision. Therefore, any age-related statements made by Fisher are not sufficient to establish a prima facie case. Frieze v. Boatmen's Bank of Belton, 950 F.2d 538, 541 (8th Cir.1991) (statements made by non-decisionmakers cannot create a reasonable inference of age discrimination); Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir.1991) (remarks made by non-decisionmakers are insufficient to establish discriminatory animus); see also Hudson v. Normandy Sch. Dist., 953 F.2d 410, 413 (8th Cir.1992) (statements to the effect of "Aren't you old enough to retire yet?" not direct evidence of "willful" age discrimination because made by a non-decisionmaker).
[24] See Plaintiff's Exhibits 198 and 292 respectively. Plaintiff's Exhibit 292 is quoted above at note 18. Plaintiff's Exhibit 198, the April activity report for the Minneapolis Division, states under the heading "Issues": "Jim Wiehoff (older P-rep way behind in territory)  on written probation and being encouraged to go to T-Sales."
[25] See supra note 18.
[26] Compare the statement at issue here with the statement found by the Eighth Circuit to constitute direct evidence in Beshears, 930 F.2d at 1354 (statement by decisionmaker "to the effect that older employees have problems adapting to new employment policies").
[27] Although the third prong in Feges requires the person replacing the plaintiff to be a non-member of the protected class, Feges, 483 N.W.2d at 711, the MHRA prohibits using a person's age as a basis for a decision if the person is over the age of majority. Minn.Stat. 363.01, subd. 3. In Feges, the Court found that the plaintiff had established a prima facie case. Yet both the plaintiff and the person who replaced her were above the age of majority  the plaintiff was fifty-six years old at the time of her termination; her replacement was twenty-seven. Id. at 706. Thus, the court has phrased the final element in accordance with the Eighth Circuit's formulation in Raschick.
[28] McDonnell Douglas involved a discriminatory refusal to hire. The Eighth Circuit modified the prima facie case for a discriminatory discharge action under the ADEA such that, to establish that he was "qualified" for the position, the plaintiff Wiehoff must show that he performed at a level that met the employer's legitimate expectations. Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1977 (8th Cir.1987), cert. denied, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 290 (8th Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983) (dismissing age discrimination claim because plaintiff failed to establish he met employer's legitimate expectations).
[29] The ultimate burden of persuasion never shifts; it rests at all times with the plaintiff. Sigurdson, 386 N.W.2d at 720 n. 2 (citing Burdine, 450 U.S. at 253, 101 S.Ct. at 1093).
[30] Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and based upon the evidence introduced at trial and the Court's observations of the witnesses and their credibility, the foregoing Memorandum of Law shall constitute the Court's Findings of Fact and Conclusions of Law.