**Patricia FEGES, Appellant, petitioner,**

v.

**PERKINS RESTAURANTS,
INC., Respondent.**

Nos. C0–90–1215, C2–90–1216.

Supreme Court of Minnesota.

May 1, 1992.

Rehearing Denied June 16, 1992.

James T. Hynes, Stapleton, Nolan & McCall, St. Paul, for appellant, petitioner.

Bradlee Karan, Stuurmans & Karan, P.A., Minneapolis, for respondent.

## OPINION

WAHL, Justice.

Patricia Feges appeals from a court of appeals decision reversing a jury verdict finding breach of her employment contract by her employer, Perkins Restaurants, Inc. (Perkins), and affirming the trial court's dismissal of her age discrimination claim. 465 N.W.2d 75 (Minn.App.1991). We affirm the court of appeals on the dismissal of the age discrimination claim but reverse and reinstate the trial. court judgment on the breach of contract claim.

Feges first began to work for Perkins Restaurants as a cook in 1975, when she was 44 years old. She voluntarily quit that employment in the summer of 1976 but was rehired by Perkins in January 1977. She was promoted to kitchen manager in 1979,

at age 47, thus entering the salaried management level at Perkins.[1] In September 1980, at the age of 49, Feges was promoted from kitchen manager to general manager at the Coon Rapids Perkins. Because she was not ready to handle the duties of general manager at that time, she was removed as general manager in October, 1981, and continued her employment with Perkins as a kitchen manager. In November 1984, Feges, now 53 years old, was again promoted to general manager. She worked as general manager at the Moundsview Perkins until her employment was terminated in August 1987 and she was replaced by 27 year old Martin Lund.

While Feges was employed as a kitchen manager at the Blaine Perkins in 1982, she was given a document called "Field Human Resources Manual," commonly known as the Human Resources Policy Manual (HRPM). The HRPM itself was not generally distributed to Perkins' employees; instead, one or two copies were maintained by management in each restaurant. According to testimony, managers, including Feges, went over pertinent personnel policies of the manual with new employees as part of their orientation and training. Some of the policies explicitly applied to management employees, others to all employees.

One of the provisions of the HRPM was Policy 445, which was described as being applicable to all employees. It provided:

> It is Perkins' policy that documented progressive warnings be issued to employees in case of substandard performance and/or violation of company policy or procedures. The only exception to progressive discipline will be a violation of the items on the Prohibited Conduct list which lead to immediate termination.

Policy 445 outlined a three-step discipline procedure requiring that a verbal warning, first written warning, and final written warning be given before terminating an employee.

In 1984, Perkins prepared and distributed to its employees a booklet entitled "Employee Handbook" (Handbook). Feges received a copy of the Handbook and signed a form indicating that she had read it. The Handbook contained a prominent notice entitled "Disclaimer" expressly stating that the Handbook "shall not be construed to form a contract" between Perkins and its employees. The Handbook contained a subsection labeled "Progressive Discipline Policy" that is substantially identical with that of the HRPM.[2] The Handbook did not refer in any way to the HRPM which apparently remained in effect.

In 1986, after a change in corporate ownership, Perkins issued a "Confidential Operations Manual" (known as the "Ops Manual" to Perkins employees) to replace the HRPM and other manuals that were in previous use. The Ops Manual is a comprehensive guide to Perkins restaurant management. It covers such topics as advertising policies, governmental compliance, purchasing, payroll and accounting procedures as well as personnel policies. The Ops Manual contains the same progressive disciplinary policy as did the HRPM and the Handbook. Testimony indicated that Perkins considered the Ops Manual to be confidential and that it was to be kept locked in the general manager's office.

Perkins used an annual plan for each of its restaurants as its primary management

---

1. In the Perkins' management hierarchy, the general manager is in charge of the entire local restaurant's operations. The kitchen manager (later known as "food production manager") is in charge of "back of the house" activities regarding the kitchen and food preparation. The dining room manager, also known as assistant or associate manager, supervises the "front of the house" and is in charge of the restaurant during the evening hours when the general manager is absent. At one time the kitchen and dining room managers were of equal rank; later, the dining room-assistant manager was designated as being second in command to the general manager.

2. In the summer of 1987, the Handbook was replaced with a revised Handbook which also contained a disclaimer and a progressive discipline policy substantially the same as the 1984 handbook. Feges did not receive the revised 1987 Handbook until after she was notified of her termination, however, and it is therefore irrelevant to her breach of contract claim.

tool. The plan set goals and objectives for each restaurant in such areas as number of customers served, total sales, average customer check, the proportion of costs attributable to food and labor, among others. The plans, developed for each restaurant, differed from each other in consideration of each restaurant's location, traffic, nearby competition, and management experience.

For the first five months of 1987, Feges' restaurant was meeting or surpassing its annual plan goals in food and labor costs but was below the regional average for those figures. On June 15, 1987, regional manager Leo Sausen, Feges' immediate supervisor, informed Feges in writing that she, as well as the other two salaried members of her management team, was being placed on probation for 60 days. The memorandum revised Feges' food and labor goals at levels more demanding than those in the annual plan. Feges' restaurant was the only restaurant of the eight in the region that was warned to improve and for which the annual plan was revised even though, by definition, other restaurants were also performing below the regional average.

Despite the more stringent goals, Feges met and exceeded the revised figures. Sausen was not satisfied, however. He testified that he believed the improvements were due more to the extra attention he and another Perkins' supervisor gave to Feges following the memorandum than to any real improvement in her management ability which he described as inconsistent and erratic.

The next written notice Feges received was a written performance appraisal given 36 days later, on July 21, in which Sausen informed Feges that she was being relieved of her job as general manager.[3] Sausen asked Feges if she would prefer a new position as a kitchen manager or a dining room manager at another Perkins restaurant. Feges told Sausen she was not interested in any job at Perkins other than as

general manager. She told him she could not handle the physical labor as kitchen manager or the late night hours required of a dining room manager. She did agree to stay on until August 11, however, when her replacement would be ready to take over.

At the time of her termination, Feges was 56 years old; her replacement was 27. He was hired by Perkins earlier in the summer, before Feges received the June 15 warning, at which time there were no openings for general managers in the region. Feges had the lowest salary of the eight general managers in the region; her replacement began as the second highest paid manager in the region.

In October 1987, Feges sued Perkins alleging breach of contract for failure to follow the progressive discipline policy and age discrimination. The claims were bifurcated with the age discrimination claim being tried first in a bench trial in Ramsey County District Court. The trial court found that Feges successfully made out a prima facie case of age discrimination, but that she failed to rebut Perkins' proffered non-discriminatory reasons for her dismissal and thereby failed to prove that she was fired because of her age. The breach of contract claim was tried to a jury which found that the progressive discipline policy contained in the HRPM was a term of Perkins' contract with Feges and that Perkins had breached it. The jury awarded Feges $49,378.95 plus attorney fees. Perkins appealed the judgment on the breach of contract claim; Feges appealed the dismissal of the age discrimination claim and asked for a new trial on damages on the breach of contract claim. The two appeals were consolidated.

The court of appeals, reversing the jury verdict, held that the progressive discipline policy contained in the HRPM did not constitute an offer for an employment contract because it was not disseminated to Feges.

---

3. Feges had received generally positive evaluations from 1986 until summer 1987. A written appraisal, dated 1–30–86, gave Feges a "fully satisfactory" rating in 42 categories, "commendable" in 13 categories, and "fair/acceptable" in two. Sausen testified he noticed Feges' performance begin to go downhill about September 1986 but she received no other formal appraisal until July 21, 1987, when she was informed of her termination.

The court of appeals affirmed the dismissal of the age discrimination claim. Before this court Feges raises three issues: whether the evidence supports the jury verdict for the plaintiff on the breach of contract claim; whether the trial court erred in instructing the jury that only damages incurred up to the date of trial were recoverable; and whether the trial court erred in dismissing the age discrimination claim.

## I.

### Breach of Contract.

Feges claims that the progressive discipline policy outlined in Policy 445 of the HRPM constituted a term of her employment contract under the principles enunciated in *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983). In *Pine River*, we applied traditional contract formation principles to hold that an employee handbook may constitute terms of an employment contract if (1) the terms are definite in form; (2) the terms are communicated to the employee; (3) the offer is accepted by the employee; and (4) consideration is given. *Id.* at 626–27.

■ Perkins concedes that the language of Policy 445 is sufficiently definite to constitute an offer and raises no serious questions regarding Feges' acceptance of the offer and whether consideration is present. Perkins reads *Pine River*, however, to require a general dissemination of the employee handbook to *all* employees before the progressive discipline policy could be considered as a contractual offer.

Perkins' argument derives from footnote 4 of *Pine River* in which this court cited cases holding that the mere existence of a personnel policy, available to management but not distributed to employees generally, was a mere policy guide and not a contractual offer to employees. *See Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 117 N.W.2d 213 (1962); *Degen v. Investors Diversified Services, Inc.*, 260 Minn. 424, 110 N.W.2d 863 (1961). Perkins argues that the HRPM, because it was distributed only to management employees, could not

be objectively considered an offer to contract as a matter of law.

At least one panel of the court of appeals has read *Pine River* as Perkins reads it. In *Tobias v. Montgomery Ward and Company*, 362 N.W.2d 380 (Minn.Ct.App.1985), the court held that a company personnel manual policy regarding overtime meal allowances was not enforceable as a term of an employment contract because the manual was not distributed to employees, despite the fact that two of the three employees seeking reimbursement were personnel managers, were authorized to maintain the manual and had knowledge of its contents. *Id.* at 381–82.

In *Herron v. Green Tree Acceptance, Inc.*, 411 N.W.2d 192 (Minn.Ct.App.1987), however, a different panel of the court of appeals held that:

> [F]or a unilateral contract to be formed the offer must be *communicated to the offeree.* If the offer does not exhibit the objective intent to apply to a particular employee, then a contract cannot be formed with that individual, regardless of the definite form of the offer itself. In such a case the employee is not the offeree to whom the offer must be communicated for formation of a contract. Whether the proposal is meant to be an offer for a unilateral contract with a particular person is determined by the outward manifestations of the parties and not their subjective intentions.

*Herron*, 411 N.W.2d at 195 (citations omitted) (emphasis in original).

■ *Herron* correctly interprets *Pine River.* The decisive question is whether the manual was communicated to the employee seeking to invoke its provisions in a way that objectively manifests an offer to contract for employment. This question is a question of fact for the jury to determine. Here, the jury found that the progressive discipline policy was an offer communicated to Feges and, upon her acceptance, became a term of her employment contract. We will not disturb a jury's factual determination unless it is "perverse and palpably contrary to the evidence." *Jacobs v. Rosemount Dodge–Winnebago South*, 310

N.W.2d 71, 76 (Minn.1981). We hold the evidence is sufficient to support the jury's finding that the progressive discipline policy of the Human Resources Policy Manual was communicated to the employee and, upon her acceptance, constituted a term of her employment contract.

■ Perkins advances other arguments, not reached by the court of appeals, which would preclude its being contractually bound by the progressive discipline policy. First, Perkins argues that even if the HRPM was communicated to Feges, the company's express reservation of the power to amend and change the HRPM objectively indicates its intention not to be bound by the HRPM's terms and that the HRPM is therefore only a general statement of policy. This argument has no merit. Perkins did not reserve for itself the power to ignore the HRPM or to act arbitrarily; it merely reserved the power to change the HRPM.

We recognized in *Pine River* that employers may modify the terms of contracts created by employee handbooks without great difficulty.

> [W]e do not think that applying the unilateral contract doctrine to personnel handbooks unduly circumscribes the employer's discretion. Unilateral contract modification of the employment contract may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters *or reserve the right to amend or modify the handbook provisions.*

*Pine River,* 333 N.W.2d at 627 (emphasis added).

■ We did not mean to imply, however, that a mere reservation of the right to amend or modify the handbook precluded the handbook from being a contract. Rather, we meant to instruct employers on how, if their handbook constitutes a contract with their employees, they may subsequently modify it. An offerer of a unilateral contract always retains the power to modify or revoke the offer so long as the offeree has not begun performance, *Sylvestre v. State,* 298 Minn. 142, 157, 214 N.W.2d 658, 667 (1973), but retention of

that power does not preclude the offer from becoming a contract once accepted by the offeree by tender of performance.

■ Perkins next argues that even if the HRPM constituted an offer for a unilateral employment contract, the 1984 Employee Handbook and the Ops Manual effectively revoked that offer. It argues that a prominent "Disclaimer" in the Handbook proclaiming that the Handbook "shall not be construed to form a contract between the Company and its employees. Rather, it describes the Company's general philosophy concerning policies and procedures" effectively revoked whatever legal effect the HRPM might have had.

■ It is true that an offer to make a contract may be revoked by words or conduct inconsistent with the offer at any time before the offer is accepted. As in any other contractual offer, however, a unilateral contract cannot be revoked without communicating the intent to revoke to the offeree. Therefore while the Handbook's disclaimer presumably precludes employees hired after its distribution from claiming contractual rights under the Handbook, it did not expressly revoke the HRPM or any other prior employment contract a pre-Handbook employee like Feges may have had. Perkins never communicated any intent to revoke or rescind the HRPM as to Feges. The inclusion of the progressive discipline policy in the Handbook was entirely consistent with that set out in the HRPM. Perkins was contractually obligated to use the progressive discipline policy before terminating Feges. Perkins, the party claiming rescission, has not met its burden of proof by clear and convincing evidence. *Desnick v. Mast,* 311 Minn. 356, 365, 249 N.W.2d 878, 884 (1976).

We hold that Perkins, the employer, never, by words or conduct, effectively revoked the offer of the progressive discipline policy of the HRPM as a term of its employment contract with its employee Feges. We therefore reverse the court of appeals and reinstate the jury verdict on the breach of contract claim.

## II.

### *Damages.*

■ Both Perkins and Feges challenge the damages award. Perkins argues at the outset that there was no material breach of the HRPM because Perkins substantially complied with the progressive discipline policy and because Feges quit. This contention is without merit. On the evidence before it—Feges' termination 36 days after receiving her first written notice and being placed on 60 day probation—the jury could find "that Perkins failed to perform a substantial part of what was promised in the contract." As to whether Feges quit, the termination report indicated Feges' termination was involuntary—for "unsatisfactory performance."

■ The jury found that Perkins' breach of the HRPM caused Feges to suffer monetary damages in the amount of $49,378.95. Perkins argues that Feges has failed to prove that the termination caused her any damages because she could have accepted two alternative positions at the same salary.

■ Generally, in a wrongful discharge case, if the employer offers in good faith to reemploy the discharged employee in the same or similar capacity at the same salary, the employee's failure to accept the offer mitigates the damages for which the employer is liable. *Schisler v. Perfection Milker Co.*, 193 Minn. 160, 161, 258 N.W. 17, 17 (1934). However, the employee is not required to accept the position if doing so would be offensive or degrading. *Id.; see also Cooper v. Stronge & Warner Co.*, 111 Minn. 177, 126 N.W. 541 (1910) (employee not required to accept other work of "a more menial kind").

This avoidable consequences rule is applicable in this case and the jury was appropriately instructed on the rule. There is ample evidence, however, that the two positions offered were not, in fact, equivalent to that of general manager. First, even though Sausen testified that he intended to pay Feges the same salary at the other jobs, he and Feges both testified that Sausen did not discuss salary when he told her

of her termination. She therefore had no reason to know that the positions would pay the same. In addition, the salary range of the two alternative positions was lower than the range of the general manager and made long-term earnings potential not equivalent.

The duties were significantly different. The two positions offered to Feges were of lower status in the Perkins' hierarchy. The positions were at different restaurants. The kitchen manager position required physical labor not required of a general manager; the dining room manager position would have required Feges to work the evening shift whereas as general manager she usually worked days. While neither of the offered positions is inherently degrading, it is reasonable that Feges would not consider them similar to her current position, justifying her refusal to accept them, regardless of salary.

■ Finally, Sausen testified that he did not expect Feges to accept either of the other two jobs when he offered them to her. This admission would permit the jury to question whether the offers were made in good faith.

Based on this evidence, the jury could reasonably have found either that Perkins' offer was not for a position in a "similar capacity" or that the offer was not made in good faith, or both. We hold that the jury had sufficient evidence to support its finding that the breach caused damages.

■ Feges argues that the trial court erred in instructing the jury that damages were available for losses incurred only up to the trial date. In employment contracts, the general rule is that "[t]he measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged would have received had the contract been carried out according to its terms." *Zeller v. Prior Lake Public Schools*, 259 Minn. 487, 493, 108 N.W.2d 602, 606 (1961), *cited in Pine River*, 333 N.W.2d at 632. However, prospective damages for breach of an employment contract beyond the time of trial have been con-

sidered too uncertain to be allowed. 11B *Dunnell Minn. Digest 2d Master & Servant* § 2.10(h) (3d ed. 1984) (citing *McMullan v. Dickinson Co.*, 60 Minn. 156, 62 N.W. 120 (1895)).

Jury Instruction Guide 665 provides:

Damages for breach of an employment contract consist of the compensation which an employee who has been wrongfully discharged would have received if the contract had been carried out according to its terms.

In this case, the trial court modified JIG 665 by instructing that only damages incurred before the trial were recoverable. The trial court's authority for this modification appears to be *Pine River*. As Feges correctly points out, however, *Pine River* clarified that damages up to the day of trial are permitted but neither held nor suggested any principle that would justify limiting damages to those incurred by the time of trial.

■ The greatest danger of post-trial or front-pay damages in employment cases is their uncertainty. This danger can be alleviated in several ways, however. First, the plaintiff's duty to mitigate damages limits front-pay awards to those cases where the plaintiff has been unable to find comparable employment after termination. Second, front-pay damage awards must be based on reasonably objective evidence as to the feasibility of reinstatement, the employee's prospects for future employment, the certainty of what the employee's income would have been absent the breach, and the length of time for which front-pay is sought. *See Riethmiller v. Blue Cross & Blue Shield of Michigan*, 151 Mich.App. 188, 198–202, 390 N.W.2d 227, 232–33 (1986) (affirming trial court's denial of front-pay in an age discrimination case); *see also Snow v. Pillsbury*, 650 F.Supp. 299, 300–01 (D.Minn.1986) (denying 9–year front-pay award on grounds it was too speculative that plaintiff would have voluntarily remained employed in same position until retirement, but awarding 3 years front-pay). Finally, front-pay, like any con-

tract damages, is limited by those losses caused by the breach. Applying these three limiting principles, trial courts could instruct juries to fully compensate wronged plaintiffs, and reviewing courts would have a guide to determine whether the awards are unduly speculative.

■ We hold that ordinarily, it is error to instruct the jury in a breach of an employment contract case that only damages suffered before the trial are recoverable. The jury should be instructed that damages for breach of an employment contract consist of the compensation which an employee who has been wrongfully discharged would have received if the contract had been carried out according to its terms.

We find no need for a new trial on damages in this case, however. On the record before us it is not clear that the breach caused damages beyond the date of trial. The jury appears to have weighed the appropriate factors in awarding damages and we will not disturb its findings.

### III.

### *Age Discrimination.*

■ Feges bases her age discrimination claim on the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1(2). Minnesota law permits plaintiffs to prove discriminatory intent in such cases by circumstantial evidence in accordance with the analysis adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 716 (Minn. 1986) (requiring trial courts to explicitly apply *McDonnell Douglas* analysis in employment discrimination cases); *Danz v. Jones*, 263 N.W.2d 395, 399 (Minn.1978) (approving *McDonnell Douglas* analysis).[4]

■ *McDonnell Douglas* held that a plaintiff alleging a discriminatory employment practice may establish a presumption of discriminatory intent by circumstantial evidence and thus shift the burden of production to the defendant. *McDonnell*

---

**4.** Plaintiffs who have direct evidence of discriminatory intent may, of course, prove their case

without resort to the *McDonnell Douglas* scheme.

*Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Adapted to a discriminatory discharge setting, a plaintiff makes out a prima facie case of discrimination by proving that she: (1) is a member of the protected class; (2) was qualified for the position from which she was discharged; and (3) was replaced by a non-member of the protected class. *Id.* The prima facie case creates an inference of unlawful discrimination because these facts, unless otherwise explained, are more likely than not to be based on impermissible factors. *Furnco Const. Corp. v. Wates,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

▮▮▮▮▮▮ Once the prima facie case is made out, a defendant may avoid summary judgment by proffering a reason which would allow a trier of fact rationally to conclude that the employment decision has not been motivated by discriminatory animus. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The reason must be offered by admissible evidence, be of a character to justify a judgment for the defendant, and must be clear and reasonably specific enough to enable the plaintiff to rebut the proffered reason as pretextual. *Id.* at 258, 101 S.Ct. at 1096. In the words of the *Burdine* Court, the defendant's evidence must "serve[ ] simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56, 101 S.Ct. at 1095. If the defendant produces such a legitimate reason, the presumption of discrimination evaporates and the plaintiff must prove her case by proving that it is more likely than not that the proffered reason is (1) a pretext for discrimination or (2) not worthy of belief. *Id.* at 256, 101 S.Ct. at 1095.

▮▮▮ Feges clearly established her prima facie case. The trial court found, however, that Perkins met its burden of production by proffering a legitimate, non-discriminatory reason for firing Feges: her substandard and erratic performance as a manager. It further held that Feges failed to persuasively rebut those reasons or otherwise prove that her termination was because of her age.

Findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn.R.Civ.P. 52.01. Feges is aware of this standard of review, but argues that the trial court erred as a matter of law because the reasons offered by Perkins are not "legitimate, non-discriminatory" reasons in that they do not explain why Feges, alone among the eight regional managers, was singled out for termination. This argument misses the mark.

Perkins' proffered reasons for its decision to fire Feges were capable of being exposed as pretext and Feges made a valiant attempt to do so. Feges vigorously attacked the reasons by arguing that they could not be the real reasons for her firing because other managers were not similarly disciplined, even though some had similarly deficient performance records. Unfortunately for Feges, she was unable to persuade the trial court that Perkins' proffered legitimate business reasons were pretextual or unbelievable and that the real reason for her termination was her age. We find no error. There was evidence of Feges' erratic performance over a period of time, as well as evidence of Perkins' hiring and promotions of Feges and willingness to continue her employment in the up-front position of dining room manager. The order dismissing the claim of age discrimination was not clearly erroneous.

We affirm the decision of the court of appeals on the age discrimination claim—reverse on the breach of contract claim—and reinstate the judgment of the district court.