**Greyson B. MORROW, Plaintiff,**

v.

**AIR METHODS, INC., Defendant.**

No. 4–92–1263.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 25, 1995.

the Minneapolis/St. Paul area and Greyson Morrow was employed as a helicopter pilot. Morrow was apparently an intelligent, able and competent helicopter pilot. He was a 1974 graduate of the United States Air Force Academy and served six years on active duty as a commissioned officer. He then worked as a civilian pilot in Alaska and Hawaii and "went where the work was." Ultimately, in 1985, he went to work for Air Methods. Then in 1987 he joined the Minnesota National Guard as a helicopter pilot and at the time of trial held the rank of Chief Warrant Officer (W–3). (This was apparently a somewhat common practice since five of the Air Methods pilots were members of the National Guard and one was in the U.S. Army Reserve.)

Morrow worked for Air Methods for seven years—from May 1985 until May 1992. During that time he served a couple of years as Area Manager, but resigned from the management position and reverted to staff pilot. This lawsuit does not involve his former status as Area Manager.

In May of 1992, Air Methods terminated Morrow's employment because of his poor attitude and repeated expressions of hostility toward the company. Morrow claims that his discharge was the result of his refusal to violate certain Federal Aviation Regulations ("FARs").

It is not necessary to recite in detail all of the evidence from the 17 witnesses that were produced by Morrow and testified before the jury. It will suffice to say that the record is replete with testimony that Morrow had a severe "attitude problem." He was "abrasive," "arrogant," "irritable," "uncooperative," "unpleasant," "not supportive," "abusive," and "negative." He seemed to be "dissatisfied" with Air Methods and its management, sending a flood of letters, memos, complaints, charges, rebuttals, and explanations to his superiors in the company. In fact, a common thread is woven through the fabric of this case: both orally and in writing, Morrow demonstrated an intolerable degree of insubordinate conduct toward his superiors

Thomas A. Harder, St. Paul, MN, for plaintiff.

Steven J. Merker, Denver, CO, Sally A. Scoggin, St. Paul, MN, for defendant.

## OPINION

RICHARD MILLS, District Judge [*]:

A "whistleblower" case.

After nine days of trial by jury, and at the close of Plaintiff's case, judgment must be entered for Defendant as a matter of law.

### Facts

Air Methods provides helicopter air ambulance services to a consortium of hospitals in

[*] U.S. District Judge Richard Mills, Central District of Illinois, sitting by designation.

in the corporate chain of command and to the management officers of his employer.

It is a marvel to this court that he wasn't fired long before he was!

## Claims

Morrow sued Air Methods, alleging (1) discharge in violation of Minnesota's "whistleblower" statute, (2) common law discharge in violation of public policy, (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, (5) breach of contract, (6) intentional misrepresentation, and (7) promissory estoppel. He also sought punitive damages.

Prior to trial, summary judgment was granted for Defendant on all the claims except the statutory "whistleblower" claim and the contract claim. These two claims went to trial.

## Judgment as a Matter of Law Standard

■ Fed.R.Civ.P. 50(a)(1) tells us that:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

In this circuit, a motion for judgment as a matter of law is properly allowed if "the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict." *Johnson v. Cowell Steel Structures, Inc.*, 991 F.2d 474, 478 (8th Cir.1993) (citing *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86 (8th Cir.1990)).

**1.** Morrow contends that the FARs incorporate each helicopter's approved Rotorcraft Flight Manual ("RFM") which, he claims, sets forth a specific procedure for preflight inspection.

## Analysis

Simply stated, Plaintiff has failed to produce sufficient evidence from which a reasonable jury could find for him on either claim.

## I. *THE "WHISTLEBLOWER" CLAIM*

Minnesota's "whistleblower" statute prohibits an employer from taking adverse employment action against an employee because

(a) The employee ... in good faith reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

\* \* \* \* \* \*

(c) The employee refuses an employer's order to perform an action that the employee has an objection basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason.

M.S.A. § 181.932(1)(c).

### A. *The Preflight Incident*

■ On about March 14, 1992, Clyde Craig, Plaintiff's supervisor, landed a helicopter and—with the engine still running—asked Morrow to fly the aircraft on a training flight. He refused and claims that he was fired as a result of his refusal.

According to Morrow, Craig's request to fly the helicopter without shutting down the engine would violate the FARs. Morrow claims that the FARs require him to perform a preflight inspection of the aircraft with the engine shut down.

However, the FARs provide no support for Plaintiff's position. The FARs do not require any specific type of preflight inspection, much less require that the engine be shut down to perform a preflight inspection. The FARs merely require a pilot to "become familiar with all available information concerning [the] flight," 14 C.F.R. § 91.103, and to "determin[e] whether [the] aircraft is in condition for safe flight," *id.* § 91.7(b).[1] Al-

However, the FARs only require compliance with the "operating limitations" in the RFM, 14 C.F.R. § 91.9(a), which contain no reference to preflight inspections.

though a pilot may decide that he would *prefer* to conduct a preflight inspection with the engine shut down, it clearly would not be a violation of the FARs to conduct a preflight inspection with the engine running.

Testimony from several pilots, including Federal Aviation Administration ("FAA") Designated Flight Examiners,[2] makes clear that it is not only possible, but is common practice to "become familiar with all available information" and to "determin[e] whether [the] aircraft is in condition for safe flight" by conducting a preflight inspection of an aircraft that has just landed and while the engine is running. Several pilots testified that FAA Inspectors often conduct flight tests in this manner. Air Methods' Operations Manual, which is inspected and accepted by the FAA,[3] provides for and approves of such a procedure. In fact, Morrow admits that he has engaged in this procedure before and asked other pilots to do so.

Thus, as a matter of law, Air Methods' request for Morrow to fly a helicopter without shutting down the engine was not a request that violated the FARs.

Morrow also contends that he does not have to show that his employer's request would actually violate the FARs; it is enough that he believed that the request would violate the FARs. This position has already been squarely rejected. *Piekarski v. Home Owners Savings Bank, F.S.B.,* 956 F.2d 1484, 1492 (8th Cir.1992); *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.,* 847 F.Supp. 1437, 1447–48 (D.Minn.1994), *aff'd on other grounds,* 40 F.3d 278 (8th Cir.1994).

Accordingly, Plaintiff Morrow cannot base his "whistleblower" claim on the preflight incident.

### B. *The Marshfield Flight*

■ On about March 15, 1992, a call came in for a mission to Marshfield, Wisconsin. Craig asked Morrow to act as co-pilot on the mission. Morrow states that he initially agreed to take the flight. Then, upon reflec-

tion, he declined the mission because he was worried about scheduling problems that might result the next day. Craig told Morrow he would take care of any scheduling problems for the next day. Finally, upon further reflection, Morrow declined the mission because he concluded that he did not have 10 hours of rest, as required by the FARs. 14 C.F.R. § 135.271(b). Craig then found another co-pilot.

Morrow did not tell Craig how much additional rest time he needed to satisfy the 10 hour requirement. All of the testimony suggests that Craig believed that Morrow was only 20 minutes short of the 10 hour requirement, and was willing to delay the flight for that long. Thus, Craig was angry at Morrow for refusing the flight.

In fact, Morrow was approximately two hours short of the 10 hour requirement. When Craig learned of this, he acknowledged that it would have been inappropriate for Morrow to have taken the flight, made this clear to his supervisors, and apologized to Morrow.

No reasonable jury could conclude that Craig believed he was asking Morrow to violate the 10 hour requirement or that Craig wanted Morrow to do so. Thus, no request to perform an illegal act in connection with the Marshfield flight took place, which is required to state a "whistleblower" claim. *Piekarski,* 956 F.2d at 1492 (employer must have actually wanted employee to commit illegal act) (citation omitted); *Petroskey,* 847 F.Supp. at 1448 (same).

### II. *THE CONTRACT CLAIM*

Morrow's contract claim is based upon two handbooks published by Air Methods: an "Employee Handbook" and a "Flight Center Supplement." Morrow claims Air Methods failed to follow certain sections of these handbooks.

---

**2.** A Designated Flight Examiner is authorized by the FAA to administer flight tests and issue pilots licenses.

**3.** The Operations Manual specifies operating procedures for a particular commercial operator,

such as Air Methods. The FARs require each operator to develop an Operations Manual, have it accepted by the FAA, and adhere to it. 14 C.F.R. § 135.21.

■ Under Minnesota law, an employee handbook can give rise to a contract where (1) the handbook constitutes an offer to enter into a contract, (2) the offer is accepted by the employee, and (3) there is consideration. *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626–27 (Minn.1983).

■ Whether a handbook constitutes an offer is determined by the outward manifestations of the parties. *Id.* at 626. Thus, an employer's disclaimer of intent to form a contract in a handbook will prevent the handbook from being construed as an offer. *Michaelson v. Minnesota Mining & Mfg. Co.,* 474 N.W.2d 174, 179 (Minn.Ct.App.1991), *aff'd,* 479 N.W.2d 58 (Minn.1992) (table); *Audette v. Northeast State Bank of Minneapolis,* 436 N.W.2d 125, 126–127 (Minn.Ct. App.1989); *see also Feges v. Perkins Restaurants, Inc.,* 483 N.W.2d 701, 708 (Minn.1992) (disclaimer would presumably preclude claim based solely upon handbook containing the disclaimer).

■ In this case, both the Employee Handbook and the Flight Center Supplement contain clear disclaimers. The Employee Handbook expressly states, on page 1:

> None of the policies referred to above or in the body of this handbook constitute a promise by Air Methods Corporation, its officers, or directors, nor do they form an employment contract between Air Methods and its employees.

Similarly, page one of the Flight Center Supplement expressly states:

> None of the policies referred to in this supplement constitute a promise by Air Methods Corporation, its officers or directors nor do they form an employment contract between Air Methods and its employees.

Thus, neither the Employee Handbook nor the Flight Center Supplement can be considered an offer.

Morrow relies upon the federal district court case of *O'Brien v. A.B.P. Midwest, Inc.,* 814 F.Supp. 766 (D.Minn.1992), to argue for an exception to Minnesota's disclaimer rule. Specifically, Morrow cites *O'Brien* for the proposition that, notwithstanding a clear general disclaimer in a handbook, a specific provision of the handbook may still be construed as an offer if it can be interpreted as manifesting an intent to be bound. *Id.* at 776. *O'Brien,* however, cites no authority for this conclusion and was ruling in the context of a pretrial summary judgment motion, not after the close of plaintiff's trial evidence as in this case.[4]

In *Audette,* the defendant-employer's handbook contained a general disclaimer, but also contained specific provisions on employee termination which the plaintiff-employee claimed were mandatory. 436 N.W.2d at 126. Despite such specific provisions, the Minnesota Court of Appeals held that the disclaimer was effective. *Id.* at 127. Like Morrow here, the plaintiff-employee in *Audette* argued that the termination section of the handbook rendered the disclaimer ambiguous. The Minnesota court, however, faced with nearly identical disclaimer language to that at bench here, rejected this argument. *Id.*

Similarly, in *Feges,* an employee handbook contained a disclaimer, but also contained specific disciplinary procedures which were to be followed except for instances of certain enumerated types of employee misconduct. 483 N.W.2d at 705. Notwithstanding this mandatory, specific language, the Minnesota Supreme Court stated that if the plaintiff-employee's claim were based upon the handbook alone, the claim would have presumably failed as a result of the disclaimer. *Id.* at 708. Again, the operative language in the disclaimer was nearly identical to the disclaimer at issue here. *Id.* at 705.

This Court, sitting in diversity, is bound to follow closely Minnesota's interpretations of its own laws. Consequently, this Court must reject Plaintiff's invitation to create an exception to Minnesota's disclaimer rule.

4. In this case, Morrow in fact did not know whether he had even read the Employee Handbook and presented no evidence at all regarding whether he had read the Flight Center Supplement. *Pine River,* 333 N.W.2d at 627 (employee must have knowledge of new terms or conditions).

Accordingly, neither the Employee Handbook nor the Flight Center Supplement can be considered an offer, as required to give rise to a contract under Minnesota law. Morrow's contract claim based upon these documents must fail as a matter of law.

*Ergo,* pursuant to Fed.R.Civ.P. 50(a), judgment as a matter of law is granted in favor of Defendant Air Methods on all of Plaintiff Greyson Morrow's remaining claims.

IT IS SO ORDERED.

CASE CLOSED.