Hye S. THOMPSON, Plaintiff,

v.

OLSTEN KIMBERLY QUALITYCARE, INC., Defendant.

No. CIV. 97–11 (JRT/RLE).

United States District Court, D. Minnesota.

Feb. 4, 1999.

Clayton D. Halunen, Law Office, Minneapolis, MN, for plaintiff.

Andrew J. Boling and Patricia O. O'Brien, Baker & McKenzie, Chicago, IL, and Joseph

J. Roby, Jr. and David M. Johnson, Johnson, Killen, Thibodeau & Seiler, Duluth, MN, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff Hye S. Thompson ("Thompson") brings this action against her former employer, Olsten Kimberly Qualitycare, Inc. ("Olsten") alleging national origin discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn.Stat. §§ 363.01–363.15, defamation, and negligent supervision and retention. In September 1997 the Court granted defendant Olsten's motion to dismiss Thompson's negligent supervision and retention claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. This matter is presently before the Court on Olsten's motion for summary judgment dismissing Thompson's remaining claims for defamation and violation of the MHRA.

## BACKGROUND

Defendant is an agency engaged in the business of employing and providing medically trained personnel to businesses such as nursing homes for the purpose of filling staffing deficiencies, and to individuals as home health care workers. Defendant hired plaintiff, a woman of Korean descent, on November 8, 1995. She continued to work there until defendant terminated her involuntarily on May 10, 1996. On the date defendant hired her plaintiff was certified as a registered nurse (RN), having completed the certification process to become an RN just four months earlier in July 1995. During her tenure as defendant's employee she was the only non-Caucasian RN employed there.

According to plaintiff, defendant's agent told her before hiring her that there was a lot of RN work available for a person with her qualifications. Plaintiff asserts that during her initial employee orientation, defendant told her to list herself as an RN on all client forms and other paperwork. At the time of plaintiff's hiring defendant strictly followed a company policy whereby an RN could not be placed in unsupervised RN positions without at least one year of experience in the nurse's desired area of practice. Defendant's written job description for the RN position explicitly states this requirement, although plaintiff apparently did not receive a copy of the description until May 8, 1996, just two days prior to her termination. Moreover, although defendant claims to have informed plaintiff of this requirement on the date of her hiring, plaintiff claims that defendant did not tell her about it until April 25, 1996—almost six months after she began working there.

Due to this experience requirement, defendant's managers told staffing coordinators to give plaintiff only assignments involving supervised RN work. Supervised RN work consisted mainly of work in nursing home or hospital "supplemental staffing" positions, while unsupervised RN work included home health care placements with individuals as well as any supervisory position. In addition to supervised RN work, plaintiff was also eligible to work in both supervised and unsupervised positions requiring training at a level less than RN certification. These positions included Licensed Practical Nurse (LPN), Personal Care Attendant (PCA), and home health aide placements. All of these positions paid employees at a significantly lower hourly rate than either supervised or unsupervised RN positions.

Defendant asserts that upon beginning her employment, plaintiff stated that she wanted to work as many hours as possible and would take whatever positions were available. Plaintiff does not dispute this assertion. Defendant claims that it attempted to satisfy plaintiff's request, and generally assigned her to her first choice of positions. Defendant's employee files demonstrate that plaintiff worked more total hours during her tenure than almost any other nurse. Plaintiff disputes defendant's characterization of its practices, and states that defendant often gave her low-paid LPN work, even when other RN's complained that they had more work to do than they could handle. Plaintiff does not explain whether this overload of work consisted of supervised or unsupervised

RN positions. Moreover, plaintiff offers no evidence of any RN employed by defendant with less than one year of experience who was permitted to work in a supervisory, home health care or otherwise unsupervised placement.

Plaintiff's brief employment with defendant was characterized by several difficulties that defendant alleges lead to her termination. The first of these involved plaintiff's home health care placement with a client in Eveleth, Minnesota in the fall of 1995. Defendant classified plaintiff for this work as an LPN, since it was an unsupervised position and she did not yet have the requisite year of experience. Plaintiff initially filled out her time card for hours with this client as an LPN by using the appropriate code for this position designated by defendant. The LPN code was associated with a billing rate of $11.50 per hour. Plaintiff states that the Eveleth client was a particularly difficult person to work with. She asserts that occasionally defendant would agree to raise billing rates on particularly difficult cases as an incentive to employees. Plaintiff claims that because the Eveleth client was difficult, defendant raised her billing rate for that placement to the regular RN rate of $25.00 per hour in late December 1995. Plaintiff claims that defendant's staffing coordinator, Patricia Askagaard, approved the raise. Accordingly, plaintiff began filling out her time cards using the code designated for RN positions. Defendant denies approving the $25.00 per hour rate and states that it did not discover that plaintiff was using the RN code on her time cards for that placement until April 1996.

The billing discrepancy lead to a meeting on April 25, 1996. Defendant alleges that the meeting was disciplinary in nature, although defendant's "employee contact sheet" documenting the meeting describes it as "educational." Plaintiff claims that during this meeting defendant informed her for the first time of its requirement that RN's working in home health care must have a full year of experience. Defendant also told her that she could no longer bill her time with the Eveleth client at $25.00 per hour. Plaintiff refused to do any further work with the Eveleth client,

and states that she had already given two week's notice of her intent to quit seeing that client on April 24, 1996. Plaintiff also accused defendant of discriminating against her on the basis of national origin by scheduling her to work in undesirable placements while giving Caucasian RN's more profitable work. Defendant did not require plaintiff to pay back the alleged overpayment, and did not otherwise discipline plaintiff for the incident.

After the April 25 meeting, plaintiff's scheduled hours substantially decreased. Plaintiff argues that defendant was retaliating against her in response to her national origin discrimination complaint. Defendant asserts that it attempted to accommodate her request for more hours, but could find little work for which she was qualified at that time. Defendant specifically states that it could not easily find additional work to replace the Eveleth client because most of the available hours had already been scheduled with other employees for the next few weeks.

In addition to the billing incident with the Eveleth client, defendant asserts that plaintiff double-billed her time on January 28, 1996 by submitting two time sheets. Plaintiff argues that the double-billing was a mistake, and asserts that she immediately reported the problem upon receipt of her paycheck. She further states that she voluntarily reimbursed defendant for the overpayment. Defendant does not dispute this assertion and did not discipline plaintiff as a result of the incident.

Defendant also claims that plaintiff failed to appear for an assignment on March 23 and March 24, 1996, and did not call into the office to explain her reasons for missing the appointment. The parties describe such incidents as "no-call/no-shows." Defendant's employee handbook states that a single no-call/no-show is grounds for immediate dismissal. Plaintiff asserts that she did not appear for the appointment because defendant's scheduler, Lynn Dwornokowski ("Dwornokowski"), gave her incorrect dates for the assignment. Plaintiff specifically states that Dwornokowski listed the dates as April 23 and April 24 on a slip of paper that she handed to plaintiff describing the assignment. Plaintiff states that she gave this slip

of paper to defendant when it accused her of missing the appointment. Dwornokowski later acknowledged that she may have made a mistake, and defendant did not discipline plaintiff as a result of the incident.

Defendant states that plaintiff also failed to call in or appear for an appointment on May 9, 1996 with a vulnerable adult. Plaintiff asserts that defendant never informed her that she was scheduled to work with the client on that date. She states that she visited another client in the same building on the same date, and argues that she would have had no reason to miss the appointment since she was already on location. She suggests that Dwornokowski made a scheduling error, and points to evidence demonstrating that defendant disciplined Dwornokowski on several prior occasions for failure to communicate and for misrepresenting schedules.

Defendant called plaintiff into the office on May 10, 1996 and told her that it was terminating her as a result of the May 9 no-call/no-show. Plaintiff argues that defendant should not have terminated her without further investigation, because it had in its possession a note from scheduler Patricia Askegaard listing plaintiff's assignments for the month that contained no assignment listing for any client on May 9. The meeting ended when plaintiff left the office and stated that she intended to contact an attorney.

Defendant's staff management manual suggests that supervisors use a progressive discipline process before terminating employees. The first step in the suggested process is to give the employee verbal "corrective counseling" that is documented in writing and placed in the employee's personnel file. The second step is to issue a formal, written reprimand. The final step in the process is involuntary termination. This process is merely suggested, however, and the manual specifically states that "[d]isciplinary action may ... begin at an advanced stage of the disciplinary process or may involve immediate termination based upon the nature and severity of the offense, the employee's past record with the Company and any other relevant circumstances." Although defendant's employee handbook states that even one no-call/no-show can result in immediate dismiss-

al, defendant can point to no evidence demonstrating that, prior to plaintiff's dismissal, it had ever terminated an employee as a result of a single no-call/no-show. The record reflects that defendant terminated several employees prior to plaintiff on the basis of multiple no-call/no-shows.

Immediately after dismissing plaintiff, her supervisor, Lori Randa ("Randa"), called the state nursing board and asked whether termination for a no-call/no-show was an incident reportable to the board. In response, the board requested that defendant send to it a complaint registration containing a list of its reasons for terminating plaintiff. Randa complied with this request, listing the January 28 double-billing incident, the Eveleth client incident, the May 9 no-call/no-show incident, cancellation of an assignment that she had previously accepted, negative attitude, and "verbal abuse of company employees" as reasons for plaintiff's termination. Randa admits that, prior to plaintiff, she had never reported a nurse to the nursing board during her employment with defendant. She further admits that several employees prior to plaintiff had been terminated as a result of multiple no-call/no-shows, and that defendant did not report these employees to the nursing board. The nursing board conducted an investigation into plaintiff's conduct as a result of defendant's report, but decided not to discipline plaintiff.

Plaintiff states that following her dismissal prospective employers required her to report the reasons for her termination, and to report that she had been under investigation by the nursing board. Plaintiff claims that she was unable to obtain additional employment without changing her residence to another state because of these reports.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Only

disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* In considering a motion for summary judgment, a court must view the facts in a light most favorable to the nonmoving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *See Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983).

## II. National Origin Discrimination

Plaintiff argues that defendant's actions throughout her employment and dismissal constituted discrimination on the basis of national origin in violation of the MHRA. The MHRA states in relevant part that, "[e]xcept when based on a bona fide occupational qualification, it is unfair employment practice ... [f]or an employer, because of ... national origin ... to discharge an employee; or ... to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn.Stat. § 363.03.

 Plaintiff acknowledges that no employee working for defendant ever made a derogatory comment to her about her national origin, and thus, she has proffered no direct evidence of discrimination. Nevertheless, a party need not prove employment discrimination through direct evidence. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In the absence of direct evidence, courts analyze the MHRA using the familiar burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986); *Danz v. Jones,* 263 N.W.2d 395, 398–99 (Minn.1978). Under this basic framework, a plaintiff must first establish a prima facie

case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "The requirements of a proper prima facie case vary from case to case and with each set of differing factual circumstances." *Danz,* 263 N.W.2d at 399 (citing *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Once the plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises and the burden of production then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer is successful, the presumption disappears and the burden then shifts back to the plaintiff to show that the employer's proffered reason is really a pretext for unlawful discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff always retains the ultimate burden of proof to show that the discrimination was unlawful. *See id.* at 507, 113 S.Ct. 2742 (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### A. Defendant's Placement Practices

 Plaintiff argues that defendant discriminated against her by giving Caucasian RN's better assignments at a higher rate of pay than those she received. In order to establish a prima facie case of disparate treatment under these circumstances, plaintiff must demonstrate that:

(1) she is a member of a protected class;

(2) she sought and was qualified for opportunities that the employer made available to others;

(3) despite her qualifications, she was denied those opportunities; and

(4) the opportunities remained available or were given to other persons who were not members of the protected class.

*See Gold Star Taxi and Transp. Svc. v. Mall of Am. Co.,* 987 F.Supp. 741, 747 (D.Minn. 1997).

 Plaintiff's status as a person of Korean ancestry qualifies her as a member of a protected class. Furthermore, she has

demonstrated that she was denied the opportunity to work in unsupervised RN placements, and that defendant gave several Caucasian RN's the opportunity to perform this work. Plaintiff has nevertheless failed to demonstrate that she was qualified to work as an unsupervised RN. Defendant's written description of the RN position clearly states that at least one year of experience after receipt of RN certification is a requirement. At all times during her employment with defendant, plaintiff had been certified as an RN for less than a year. Assuming all facts in a light most favorable to plaintiff, defendant failed to inform her of its experience requirement until she had been working there for several months. Such conduct, although neglectful of defendant's responsibility to provide her with an adequate job description, does not negate defendant's submission that it strictly adhered to this policy with all employees. Plaintiff has not shown that defendant placed any RN, Caucasian or otherwise, in an unsupervised placement until the RN had the requisite year of experience. Although plaintiff states that other RN's complained about having too much work to do, she has not shown that any of this extra work was the kind of supervised work that she was qualified to perform. Plaintiff has thus failed to demonstrate that she was denied opportunities to perform work for which she was qualified. Indeed, defendant's uncontradicted employment records show that plaintiff's total number of hours worked was higher than that of almost any other employee at the agency. Because plaintiff has not demonstrated that she was qualified for the unsupervised placements that she sought, or denied other opportunities for which she was qualified, she has failed to meet all of the elements of a prima facie case. Plaintiff's evidence regarding defendant's job placement practices is thus insufficient to support her discrimination claim.

### B. Plaintiff's Termination

Plaintiff also alleges that defendant's decision to terminate her was discriminatory. She specifically asserts that defendant dismissed her based on a single no-call/no-show, and that it had never before terminated any employee as a result of a single no-call/no show. She further asserts that defendant's actions were suspect because it failed to follow the company's established "progressive discipline" process.

■ In order to state a prima facie case based on discriminatory termination, plaintiff must demonstrate that:

(1) she is a member of a protected class;

(2) she was qualified for the position that she held;

(3) she was discharged from that position; and

(4) defendant permitted non-members of the protected class to fill her position.

*See Feges v. Perkins Restaurants, Inc.,* 483 N.W.2d 701, 711 (Minn.1992).

■ As argued above, plaintiff is a member of a protected class. Furthermore, she has demonstrated that she was qualified to perform work for defendant as an LPN or a supervised RN. Defendant discharged her from that position, and does not dispute that it has hired Caucasian nurses to fill the same or similar positions with the agency. The Court accordingly finds that plaintiff has established all of the elements of a prima facie case of discrimination based on her termination from employment.

Defendant has also come forward, however, with a non-discriminatory reason for its actions. It asserts that she failed to appear or call into the office for an appointment on May 9, 1996. Defendant's employee handbook explicitly states that a single no-call/no-show can be grounds for immediate dismissal. Furthermore, plaintiff had a history of other problems throughout her brief employment. Most notably, defendant alleges that she billed her work with the Eveleth client for several months at double the rate to which she was entitled. Such egregious conduct provides an adequate basis for dismissal, and the Court therefore finds that defendant has met its burden of articulating a legitimate non-discriminatory reason for terminating plaintiff.

■ Under the *McDonnell Douglas* analysis, the presumption of discrimination thus

disappears and the burden shifts to plaintiff to show that defendant's articulated reasons for terminating her are pretextual. Plaintiff attempts to meet this burden in two ways. First, she denies that she engaged in the conduct underlying defendant's complaints. She disputes the no-call/no show and denies that she over-billed work for the Eveleth client without defendant's authorization. Plaintiff's assertions must be adopted for the purposes of this motion. The Court therefore assumes that Patricia Askegaard actually told plaintiff she could bill her work with the Eveleth client at the RN rate, and that the May 9 no-call/no-show of which plaintiff was accused was the result of a scheduling error. Nevertheless, these assumed facts merely establish that defendant incorrectly accused plaintiff—they do not establish that it did so as a pretext for discrimination. Plaintiff offers no evidence to contradict defendant's position that her supervisors genuinely believed she had committed these indiscretions.[1] Her factual attack on the grounds for her termination thus does not establish that they were pretextual.

Plaintiff also asserts that no other employee was ever discharged as the result of a single no-call/no-show. Evidence that other employees were disciplined less severely for the same conduct can be sufficient proof of pretext. See Lynn v. Deaconess Medical Center–West, 160 F.3d 484 (8th Cir.1998). To prove pretext, however, plaintiff must also show that she and the disparately treated Caucasian employees were "similarly situated in all relevant respects." See Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 972 (8th Cir.1994) (internal quotations omitted), cited in Lynn, 160 F.3d at 487. The Eighth Circuit recently held in Lynn that the violations committed by disparately treated employees need not be exactly the same. Rather a showing that violations of "comparable seriousness" were disciplined differently is sufficient to demonstrate pretext. See Lynn, 160 F.3d at 488–89.

The record reflects that defendant terminated several employees prior to plaintiff because of no-call/no-shows, but only after more than one violation had occurred. Plaintiff has not demonstrated, however, that any of these employees were "similarly situated" or had histories of comparably serious violations. Most importantly, plaintiff had a history of double-billing defendant for her time and had been accused of doing so on more than one occasion. Furthermore, she had also been accused of two prior no-call/no show incidents. Although defendant did not discipline her for those incidents because of the possibility that they resulted from scheduling errors, the alternative possibility that they resulted from plaintiff's misconduct was never entirely eliminated. These incidents notably occurred over a period of only six months of employment, and therefore, plaintiff never established a problem-free employment record for any significant length of time. Plaintiff has not pointed to any similarly situated employee who was disciplined less severely for comparably serious conduct. Therefore, she has not met the burden of proving that defendant's articulated reasons for terminating her are pretextual.

 Plaintiff also asserts that defendant violated its own policies by terminating her without going through the progressive discipline steps outlined in the staff management manual. This argument has little impact on the Court's analysis for several reasons. First, the evidence suggests that defendant attempted to implement at least some progressive discipline before terminating plaintiff. The April 25 meeting during which defendant confronted plaintiff about her billing practices could be categorized as "corrective counseling"—the first step in the process. Next, even assuming that defendant followed none of the prescribed procedures, this failure does not lead to an inference of discrimination. Plaintiff points to

---

1. With regard to the May 9 no-call/no-show, plaintiff claims that her supervisors should have relied on a note from Patricia Askegaard listing her scheduled appointments for the month but neglecting to list any appointment on May 9. Plaintiff's inference that this note contained a complete and final listing of her schedule is undermined, however, by her admission that she performed work with another client on that date. Furthermore, plaintiff informed defendant that she had another appointment on May 9 at the time of her termination, thus providing defendant with direct evidence contradicting the accuracy of the note.

no similarly situated employees who were afforded the benefit of progressive discipline. Finally, plaintiff cannot characterize the policy as a contract between defendant and its employees, since there is˝ no evidence that plaintiff or any other non-managerial employee ever saw the manual prior to the onset of this litigation. *See Feges,* 483 N.W.2d at 707 (Minn.1992). Furthermore, according to the manual's explicit text, progressive discipline is merely suggested rather than mandatory. Any implication that defendant breached a contract with plaintiff by failing to implement this policy is thus unsupported. For the above reasons, plaintiff's discriminatory termination claim does not survive defendant's motion for summary judgment.

### C. Reprisal Discrimination

█ Plaintiff additionally claims that defendant violated the provision of the MHRA prohibiting reprisals against employees who oppose illegal discrimination. Minn.Stat. § 363.03, subd. 7. Plaintiff argues that defendant retaliated against her complaints of national origin discrimination, first by drastically reducing her hours, and then by terminating her. In order to establish a prima facie case of reprisal discrimination, an employee must show:

(1) statutorily protected conduct by the employee;

(2) adverse employment action; and

(3) a causal connection between the two.

*See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983).

█ The period of time during which plaintiff complains her hours were reduced only extended from the April 25, 1996 meeting through her termination on May 10, 1996—a period of approximately two weeks. During the meeting plaintiff refused to carry out the work with the Eveleth client that defendant had already scheduled for her. Defendant states that it could not find a lot of replacement work for plaintiff on such short notice. Plaintiff has offered no evidence to contradict defendant's assertion, and the record contains no other evidence of a causal connection between plaintiff's complaint during the April 25 meeting and the reduction in

scheduled hours. Moreover, as argued above, defendant has provided nondiscriminatory reasons for its decision to terminate plaintiff, and plaintiff has not sufficiently rebutted defendant's explanation. Plaintiff offers no evidence of a connection between her termination and her complaint that Caucasian nurses were getting better assignments. Both of plaintiff's claims for reprisal discrimination therefore fail for lack of a causal connection between the protected conduct and the adverse employment action.

### III. Defamation

█ Plaintiff's defamation claim is premised on defendant's report to the state nursing board. The requisite elements of a claim sounding in defamation include proof that the alleged statements were made, that the statements were communicated to someone other than the plaintiff, that the statements were false, and that, as a result, the plaintiff's reputation was harmed. *See Ferrell v. Cross,* 557 N.W.2d 560, 565 (Minn. 1997); *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980). Even if all of the elements of defamation are present, however, Minnesota courts recognize the defense of qualified privilege. *See Ferrell,* 557 N.W.2d at 565; *McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 235 N.W.2d 371, 374 (1975). A communication is considered privileged if "made upon a proper occasion, from a proper motive, and . . . based upon reasonable or probable cause . . . . Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover." *Ferrell,* 557 N.W.2d at 565. A defendant falls within the scope of the privilege upon demonstrating that the statement was made "in good faith by a speaker who had an interest or duty with respect to the subject matter to a person having a corresponding interest or duty." *Id., citing Luecke v. Schnucks Markets, Inc.,* 85 F.3d 356, 361 (8th Cir.1996). Courts have applied the qualified privilege defense to protect statements made by employers in the context of investigating employee misconduct, on the ground that the employer's interest in protecting itself and the public from harmful employees is important. *See*

*McBride,* 235 N.W.2d at 374 (holding that statements made between employer's agents investigating employee misconduct were privileged).

■ Once a court finds that a conditional privilege exists, the burden shifts to the plaintiff to demonstrate that the defendant abused the privilege. *See Singleton v. Christ the Servant Evangelical Lutheran Church,* 541 N.W.2d 606, 615 (Minn.Ct.App. 1996). A plaintiff can satisfy this burden with a showing of malice. Malice is demonstrated by proving that the defendant made the statement at issue "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Id.* Whether a defendant has abused the qualified privilege is generally an issue of fact for jury determination. *See id.* Nevertheless, summary judgment is appropriate if there is no evidence in the record from which a jury could conclude that malice was present when the defendant made the statements. *See id.*

■ In addition to this common law conditional privilege, statements made by employers reporting to the state nursing board may be protected by statutory immunity. State law imposes upon health care institutions and licensed health care professionals an affirmative obligation to report licensed nurses who engage in conduct that could constitute grounds for disciplinary action by the nursing board. Minn.Stat. § 148.263. In order to facilitate compliance with this requirement, state law provides that:

> [a]ny person, health care facility, business or organization is immune from civil liability or criminal prosecution for submitting in good faith a report to the board [under the mandatory reporting provision] ... or for otherwise reporting in good faith to the board violations or alleged violations of [the nurse licensing statute].

Minn.Stat. § 148.264. Nursing board reports are thus protected by immunity as long as they are made in good faith. *See French v. Eagle Nursing Home, Inc.,* 973 F.Supp. 870 (D.Minn.1997).

Defendant does not contest plaintiff's prima facie case, but argues that it is entitled to both the common law conditional privilege and statutory immunity from civil liability. Since defendant is an employer who made the statements at issue to an institution with a duty to investigate employee misconduct, the Court finds as a matter of law that the conditional privilege applies in this case. The Court further finds that defendant's report to the nursing board falls within the scope of the immunity statute to the extent that defendant submitted it to the board in good faith.

■ Plaintiff does not dispute that these privileges apply in this case, but asserts that whether defendant abused the conditional privilege, and whether defendant made its report to the nursing board in good faith, are questions of fact precluding summary judgment resolution. Plaintiff asserts that it has met the burden of producing evidence of defendant's bad faith and malice. Plaintiff argues that defendant "had proof" at the time of the report that the May 9 no-call/no-show with which she was accused was the result of a scheduling error. Plaintiff's "proof," however, is contradicted by her own admissions,[2] and defendant's decision to reject it does not demonstrate bad faith or malice.

Plaintiff also notes that defendant had never reported a nurse to the board for a single no-call/no-show and argues that its decision to do so in her case was indicative of bad faith and malice. This argument is significantly undermined by the evidence that defendant's initial contact with the nursing board was in the form of an inquiry as to whether plaintiff's termination was even a reportable event. Defendant's simple request for information cannot form the basis of defamation liability, since there is no evidence that plaintiff's identity was even disclosed during that communication. The board responded to defendant's inquiry by asking it to submit a report. Defendant thus submitted the report in compliance with a specific request from the board that it do so. Defendant's failure to do so would have defied the board's specific orders and might

**2.** *See supra* note 1.

have been interpreted to be a violation of the statute's mandatory reporting requirements. Upholding defendant's report as a basis for suit would thus subject defendant to potential whipsaw liability and would impermissibly undermine the policy of encouraging honest reporting.

Plaintiff also attacks the contents of defendant's report, arguing that it should not have reported as a basis for termination incidents of misconduct for which she was never disciplined. The fact that defendant gave plaintiff the benefit of the doubt and did not discipline plaintiff for these incidents, however, does not prove that defendant was entirely convinced of her innocence. Defendant was entitled to view the complaints against plaintiff during her employment collectively and base its decision to terminate her on her entire employment record.

Plaintiff has failed to offer any evidence upon which a reasonable jury could determine that defendant's report to the nursing board was malicious or in bad faith. There is no evidence that defendant reported plaintiff's conduct to anyone outside the board. For these reasons, the Court finds that defendant's conditional privilege under the common law and immunity under the statute preclude plaintiff's defamation claim.

### ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 37] is **GRANTED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.